United States Court of Appeals,

Fifth Circuit.

No. 95-60286.

UNITED STATES of America, Plaintiff-Appellee,

v.

Perry G. BLOCKER, Defendant-Appellant.

Jan. 16, 1997.

Appeal from the United States District Court for the Southern District of Mississippi.

Before GARWOOD, HIGGINBOTHAM and BENAVIDES, Circuit Judges.

PER CURIAM:

Perry G. Blocker appeals his convictions and sentences for the offenses of mail fraud and bank fraud. Blocker argues, among other things, that a search conducted by a Mississippi insurance examiner, whom he contends was acting as an agent of the United States Government, violated the Fourth Amendment. We disagree with this contention, and affirm in part and reverse in part on other grounds.

*BACKGROUND AND PROCEDURAL HISTORY*

Defendant-appellant Perry G. Blocker, a Certified Public Accountant, was managing partner of the DeMiller, Denny, and Word accounting firm. Dan White, a codefendant, owned or controlled a number of companies in the finance and insurance fields. One group of those companies was collectively referred to as the Andrew Jackson Group. This group included Andrew Jackson Life Insurance Company (AJL), Andrew Jackson General Insurance Company, Andrew Jackson Casualty Insurance Company, and Andrew Jackson Corporation. White also owned a number of other companies in the finance and insurance fields. Blocker's accounting firm conducted the annual audit work for the Andrew Jackson Group and affiliated companies. After several years of providing financial advice to White, Blocker became the person in charge of running the Andrew Jackson Group.

Sometime in 1990, the Mississippi Insurance Department (MID) informed Blocker and White

that there was a problem with the affiliation among the White-owned companies and their interdependent investments. Subsequently, in December of 1990, Blocker purchased AJL from White by signing a note.

Meanwhile, Thomas Gober was a contract employee of MID. MID contracted with Gober to conduct triennial examinations of the financial ability and condition of domestic insurance companies. Miss.Code Ann. § 83-1-25 (1972). During the course of his examinations of various Mississippi insurance companies' records, Gober discovered what he believed to be criminal violations. Gober informed his superiors at MID and was assured that he would not be held responsible for any problems with his reports. Nevertheless, to protect himself from any charges of wrongdoing, Gober later began to record surreptitiously conversations with various individuals at MID.

In the fall of 1990, while examining the records of an unrelated insurance company, it appeared to Gober that the company was stealing from its policyholders. Gober included his information in his report and voiced his concern to his superiors at MID. He later learned that the Federal Trade Commission (FTC) might be investigating the matter and became worried that the allegations of wrongdoing would be deleted from his report.

Gober discussed his concerns with Jim Martin, a local attorney who arranged a meeting with FTC officials. At that meeting, Gober advised the FTC officials of his concerns. In response, they told him that he had a responsibility to notify the United States Attorney's office.

Gober subsequently met with Assistant United States Attorney James Tucker in September 1990. At Tucker's request, FBI Agent Glen Breedlove was also at the meeting. The three discussed Gober's work as a certified financial examiner for MID, his conclusions that certain companies were violating the law, and MID's response to his conclusions. Gober shortly thereafter agreed to furnish the FBI with any evidence of criminal activity on the part of the Mississippi insurers or MID that he encountered during the course of his work.

Beginning in September of 1990, Gober met periodically with Agent Breedlove and federal prosecutors. At those meetings, Gober provided any evidence he encountered during his

examinations that indicated criminal activity. Gober subsequently requested compensation for his time, and the FBI paid Gober at the same rate he was paid for his contract work for MID.

Additionally, the FBI provided Gober with a device for the clandestine recording of conversations that he had with officials of both MID and the insurance companies. Gober recorded all conversations because the FBI sought to avoid the accusation of selectively recording conversations. Blocker's name had been added to the FBI's monitoring list while he still was a partner at the accounting firm, prior to his purchase of AJL.

In March of 1991, the National Association of Insurance Commissioners (NAIC) sent out an annual report to the MID indicating that AJL was a "first priority" company that needed immediate regulator attention because of its low surplus and bond portfolio. MID thereafter notified Blocker that an examination was scheduled for August of 1991.

Gober was assigned to conduct the triennial examination of AJL. No one at AJL or MID knew of Gober's preexisting cooperative relationship with the United States Government. Gober began recording Blocker's conversations at a meeting between AJL officials and MID officers prior to the commencement of the actual examination of AJL.

Based on Gober's findings, and with Gober's assistance, Agent Breedlove prepared an affidavit to obtain a warrant to search the records of AJL and its affiliates. The search warrant was secured, and on February 7, 1992, the search warrant was executed, resulting in the seizure of voluminous records from AJL and its affiliates.

On June 9, 1993, a grand jury returned an indictment charging Blocker and White with aiding and abetting each other in the following offenses: 18 counts of mail fraud (defrauding the policyholders, investors, shareholders, and regulatory agencies of the Andrew Jackson Group of Insurance Companies in violation of 18 U.S.C. § 1341); and 2 counts of bank fraud (submitting false financial statements to federally insured financial institutions in violation of 18 U.S.C. § 1014). The indictment charged that Blocker and White aided and abetted each other in defrauding the policyholders, investors, shareholders, and regulatory agencies of the Andrew Jackson Group of Insurance Companies: AJL (owned by Blocker); Andrew Jackson General Insurance Company; and

Andrew Jackson Casualty Insurance Company. More specifically, the indictment charged that Blocker and White engaged in deceptive practices to continue to receive insurance premiums and investments at a time when they knew that the companies involved were insolvent or impaired.

Blocker filed a motion to suppress the evidence found by Gober during his examination and the evidence seized pursuant to the warrant. The district court, after conducting a hearing, denied the motion in a memorandum opinion, rejecting Blocker's contentions that Gober in his examination was an agent of the Federal Government and that the Mississippi statute that authorized the administrative examination violated the Fourth Amendment. After a two-week trial, a jury found Blocker guilty on the 18 counts of mail fraud and 2 counts of bank fraud.[1] The district court sentenced Blocker to 97 months imprisonment and ordered restitution in the amount of $5,708,051.

*ANALYSIS*

I. DENIAL OF MOTION TO SUPPRESS

Blocker contends that the district court erred in denying his motion to suppress the evidence obtained by Gober prior to the execution of the search warrant and all the evidence seized pursuant to the warrant. He argues that Gober was acting as an agent or instrument of the Government when Gober gathered the evidence that resulted in his prosecution. "On appeal from the denial of a motion to suppress we review the district court's factual findings under the clearly erroneous standard and its conclusions of law *de novo*." *United States v. Johnson,* 16 F.3d 69, 71 (5th Cir.1994). This Court has treated the district court's determination whether a person is acting as an agent for the Government as a factual finding. *United States v. Jenkins,* 46 F.3d 447, 460 (5th Cir.1995).[2]

It is well settled that if a private party wrongfully conducts a search or seizure of another's person or property the Fourth Amendment is not violated and that such private misconduct does not deprive the Government of the right to use evidence that it has obtained legally. *Walter v. United*

---

[1]The indictment had also charged three counts of money laundering in violation of 18 U.S.C. § 1957(a); however, the jury acquitted Blocker on the three money laundering counts.

[2]A factual finding is clearly erroneous if, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citation omitted).

*States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980). The question is whether, in view of the circumstances of the case, the private party acted as an instrument or agent of the Government when he conducted the search. *Coolidge v. New Hampshire,* 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971).[3]

To make such a determination, this Court, in recent years, has applied the test articulated by the Ninth Circuit in *United States v. Miller,* 688 F.2d 652, 657 (9th Cir.1982): (1) whether the Government knew or acquiesced in the intrusive conduct; and (2) whether the private party intended to assist law enforcement efforts or to further his own ends. *Jenkins,* 46 F.3d at 460; *United States v. Pierce,* 893 F.2d 669, 673 (5th Cir.1990); *United States v. Bazan,* 807 F.2d 1200, 1203 (5th Cir.1986), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987). In each of those cases, we assumed that the Ninth Circuit's test was an adequate formulation.[4]

The district court below, after considering all the facts and circumstances surrounding the MID audit and Gober's relationship with the FBI and United States Attorney's office, denied the motion to suppress, concluding that:

> "... Gober's examination of the records of Andrew Jackson Life was a legitimate exercise of his authority on behalf of the MID to discern the company's financial condition and was not, as Blocker contends, a pretext to search for evidence of criminal activity.... [T]he court is persuaded that Gober did not deliberately use the administrative examination procedure as a pretext for conducting a criminal investigation. The court is persuaded that Gober's purpose at Andrew Jackson Life was not to search for evidence of criminal activity, either as an agent of the state government or the federal government. Rather, his purpose was to perform a financial examination of Andrew Jackson Life in his capacity as an examiner for MID, and that is precisely what he did. During the course of that examination, he disclosed information and evidence to the FBI. But that was not the purpose for his presence on the premises, or the reason for his examination. The court, therefore, rejects defendant's contention that

---

[3]The Government argued in the district court that Blocker lacked standing to challenge the search and seizure of AJL's records. The district court opined that resolution of the standing issue was unnecessary, given its ultimate conclusion that neither AJL's nor Blocker's Fourth Amendment rights were violated. Because we agree with this conclusion, we need not consider the standing issue.

[4]Prior to those cases, this Court had indicated that "[p]reknowledge and acquiescence [of the government] make a search by a private party a search by the government." *United States v. Clegg,* 509 F.2d 605, 609 (5th Cir.1975). Accordingly, "[a]ny evidence which, for Fourth Amendment reasons, would have been excluded had it been gathered by the government *pro se* would, of course, have to be excluded if gathered by the only nominally private party." *Id.* We explained that the evidence would be excluded to deter the Government from knowingly using a private party to do that which it is prohibited from doing.

Gober used his position as examiner as a pretext for conducting a warrantless search for criminal activity." (Footnotes omitted).

In making this determination, the court relied upon, *inter alia,* uncontroverted evidence that Gober's examination of AJL was pursuant to and a part of MID's regular triennial examination of AJL; that Gober "conducted his examinations the same way after he commenced his relationship with the FBI as he had before"; that he "received his assignments from the MID and neither he, nor the FBI or United States Attorney's office had any control in directing him to any particular company, including Andrew Jackson Life"; and "though Gober received compensation from the FBI, it is clear that the compensation was for his time away from work and from his family, and not for his "services' or for the information he provided." The district court also found that Gober's MID examination of AJL would have been no different "whatsoever" had he not been involved with the FBI and the United States Attorney's office; that in his examination of AJL Gober never "went beyond that which was necessary for an administrative examination of Andrew Jackson Life's financial condition"; that the FBI and the United States Attorney's office instructed Gober "to conduct his examination as he always had" and "to do precisely that which he would do in the normal course of any examination, nothing more, nothing less and nothing different"; that Gober was never directed by the FBI or the United States Attorney's office as to "what to do" or "what to look for or what they hoped to find," and the FBI and the United States Attorney's office "never even told Gober what their investigation might concern, or what they might be interested in." None of these findings is clearly erroneous.

On appeal, Blocker challenges the district court's arguably implicit conclusion that Gober was not a Government agent, correctly asserting that the evidence establishes that the FBI knew of and acquiesced in Gober's audit of AJL's records and that Gober intended to assist the FBI in its law enforcement efforts. Blocker also argues that Gober's cooperation with the FBI was intended to further his own pecuniary interests by virtue of the compensation he received from the FBI. *See Bazan,* 807 F.2d at 1203. We need not decide whether Gober was acting as an agent of the Federal Government because even assuming, *arguendo,* that Gober was not only an agent of MID but was also acting on behalf of the FBI, we believe that no Fourth Amendment violation occurred as Gober's inspection did not intrude upon any reasonable expectation of privacy that AJL or Blocker might have

had in AJL's records.

It is settled law that the Fourth Amendment applies not only to searches and seizures of private homes, but also to searches and seizures of commercial premises. *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 311-13, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978); *See v. City of Seattle,* 387 U.S. 541, 546, 87 S.Ct. 1737, 1741, 18 L.Ed.2d 943 (1967). Under certain circumstances, however, warrantless searches on commercial property may be reasonable within the meaning of the Fourth Amendment. *See New York v. Burger,* 482 U.S. 691, 700-03, 107 S.Ct. 2636, 2643-44, 96 L.Ed.2d 601 (1987). Specifically, the Supreme Court has recognized an exception to the warrant requirement for searches of "closely" or "pervasively" regulated industries,[5] provided three criteria are met:

> "First, there must be a "substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made.... Second, the warrantless inspections must be "necessary to further [the] regulatory scheme.' ... Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.' " *Id.* at 702-03, 107 S.Ct. at 2644 (citations omitted)

It is undisputed that Gober did not have a warrant to inspect AJL's records; however, his audit was conducted pursuant to a state administrative scheme under Miss.Code Ann. § 83-1-25 (1972).[6] Blocker does not argue on appeal that the Mississippi statute fails to meet the requirements

---

[5]The threshold requirement, of course, is that the governmental regulation of the industry in question must be "close" or "pervasive." *Burger,* 482 U.S. at 702-703, 107 S.Ct. at 2644. For this purpose, a regulation is pervasive if "the regulatory presence is sufficiently comprehensive and defined that the owner of [the] commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.* at 705 n. 16, 107 S.Ct. at 2645 n. 16 (*quoting Donovan v. Dewey,* 452 U.S. 594, 600, 101 S.Ct. 2534, 2539, 69 L.Ed.2d 262 (1981)).

[6]Miss Code Ann. § 83-1-25, at the time of Gober's examination of AJL, provided, in relevant part:

> "The Commissioner of Insurance shall carefully examine the affairs of each domestic company as to its financial ability and condition as often as once in three (3) years. He shall also make an examination of such company whenever he deems it prudent to do so, or upon the request of five (5) or more of the stockholders, policyholders, creditors, or other persons pecuniarily interested therein.... Such examination shall be made by the commissioner, or by his accredited representatives, and such companies shall pay the proper charges incurred in such examination, including the expense of the commissioner or his accredited representative...."

set forth in *Burger*.[7]  Instead, he complains that because Gober conducted the audit of AJL not only in his capacity as an agent of MID, but also on behalf of the FBI, Gober's inspection went beyond the scope of his otherwise lawful authority under the Mississippi regulatory scheme so as to amount to an invasion of Blocker's and AJL's Fourth Amendment rights.  We disagree.

Neither Gober, the FBI, nor the United States Attorney's office had a hand in MID's decision to audit AJL and, as the district court found, Gober would have audited AJL at the same time, in the same manner and to the same extent regardless of whether the FBI was involved.  Once he was assigned to MID to conduct the AJL audit, Gober decided, on his own, to report to the FBI any evidence of insurance fraud discovered during his audit.  Plainly, this was not a situation where the FBI "trumped-up" a phony audit to covertly examine AJL's insurance records.  *Cf. United States v. Tweel,* 550 F.2d 297, 298 (5th Cir.1977) (explaining that the defendant was not some random, unfortunate victim of a routine IRS audit, but instead was hand-picked by the Department of Justice as the target of a criminal investigation).  Rather, Gober was a *bona fide* MID auditor who conducted an *actual* MID audit of AJL in accordance with the Mississippi regulatory scheme.[8]

The scope of Gober's MID audit of AJL was not in any way altered by his relationship with the FBI.  Gober went onto AJL's premises unaccompanied by any state or federal agents, and inspected AJL's records in a manner completely consistent with any routine MID audit.  Gober did not use the audit to "conduct a general search for incriminating materials." *Lewis v. United States,*

---

[7]Blocker did argue to the district court, in his motion to suppress, that Gober's inspection of AJL's records violated the warrant requirement to the Fourth Amendment because the Mississippi statute was not constitutionally sufficient to serve as a substitute for a search warrant.  The district court rejected this argument, concluding that "the scheme employed by the MID pursuant to the statute did, in fact, "advise [Blocker] that the search [was] being made pursuant to the law and ha[d] a properly defined scope, and it limit[ed] the discretion of [Gober].' "  (Citations omitted).  On appeal, Blocker does not challenge the constitutionality of the statute under *Burger*.

[8]That Gober went to the FBI before, instead of after, conducting his audit is a distinction without a difference in our analysis.  If Gober, without any prior contact with the FBI, had formed the intention to turn over any evidence of insurance fraud found in his audit to federal or state prosecutors—and one would certainly have to assume that an auditor would likely have that intention—Gober's failure to disclose that intention to AJL or Blocker would not render the audit a violation of AJL's or Blocker's Fourth Amendment rights, so long as his intentions did not in any way interfere with the manner in which he conducted, or the scope of, his audit.

385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966). Instead, his inspection was "limited to the purposes contemplated by the [consenting] suspect." *United States v. Bosse,* 898 F.2d 113, 115 (9th Cir.1990).

Furthermore, Gober's audit of AJL would have been made at the same time and place, and in exactly the same manner and extent, had Gober not been also acting for the FBI. The FBI did not implicitly or explicitly influence the course or form of Gober's examination. On the contrary, the FBI repeatedly told Gober to conduct his audit as he always had, emphasizing "that he was to do precisely that which he would do in the normal course of any examination, nothing more, nothing less, and nothing different." At no time did the FBI direct Gober on what to do or what to look for while inspecting AJL's records. Crucially, Gober's audit was an actual, regular MID audit and Gober looked in no place and at no document or thing, and discovered nothing, that he would not have looked in or at or discovered had he had no contact with the FBI.[9]

Unquestionably, neither AJL nor Blocker had any reasonable expectation of privacy vis-a-vis Gober's examination of AJL's records. *See Jenkins,* 46 F.3d at 456; *see also Burger,* 482 U.S. at 700-17, 107 S.Ct. at 2643-51 (persons who engage in pervasively regulated industries have a diminished expectation of privacy). AJL and Blocker, as its president, knew that it and he were subject to Mississippi's insurance regulatory scheme and that evidence of insurance fraud discovered in an MID audit of AJL could be turned over to the police or prosecutorial authorities. *Burger,* 482 U.S. at 716, 107 S.Ct. at 2651 ("The discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect"). Although Blocker or AJL arguably would have a reasonable expectation of privacy as to items on AJL's premises which are not covered by an MID audit, no such expectation of privacy exists as to items covered by the instant audit, which is all that is in issue here. Gober was authorized by statute and by Blocker to search AJL's records for, *inter alia,* evidence of insurance fraud—which

---

[9]We might well have reached a different conclusion if, for example, there was evidence that Gober had conducted his audit differently due to his relationship with the FBI or if, instead of Gober, an FBI agent falsely claiming to be an MID inspector had conducted a purported "MID audit" of AJL.

is exactly what he did. Neither Blocker nor AJL could reasonably expect that Gober would withhold such evidence from the authorities.

Citing a handful of cases, Blocker contends that a government agent may not conduct a search by misrepresenting the nature or scope of his governmental authority through fraud, deceit, or trickery. *See, e.g., United States v. Bosse,* 898 F.2d 113, 115 (9th Cir.1990); *SEC v. ESM Government Securities, Inc.,* 645 F.2d 310, 317 (5th Cir.1981); *United States v. Tweel,* 550 F.2d 297, 299 (5th Cir.1977). Blocker's reliance on these government agent "deception" cases, however, is misplaced.

In *Bosse,* the defendant (Bosse) was a firearms dealer who had an application pending for a state license to buy and sell machine guns. As part of the license application process, Dunkin, an agent from the California Department of Justice, inspected Bosse's home and surrounding premises with Bosse's consent. Accompanying Dunkin was Rusin, a federal Alcohol, Tobacco and Firearms (ATF) agent, who did not identify himself to Bosse as an ATF agent. The Ninth Circuit held that Dunkin made "a deliberate misrepresentation" of Rusin's purpose and status to Bosse. *Id.* at 115. The district court concluded that observations *by Rusin may* have been the basis for the subsequent search warrant for Bosse's home, and accordingly granted Bosse's motion for new trial.

The Ninth Circuit vacated the district court's order and remanded. It held that the district court's findings were "inconclusive ... with respect to the effect of Rusin's illegal entry and search on" the "decision to seek the warrant." *Id.* at 116. It further stated that Bosse's Fourth Amendment rights would have been violated if information gathered *by Rusin* during the inspection was used to obtain the search warrant. Whether or not Rusin's "search" disclosed matters which Dunkin's did not is not clear from the opinion. The court opined that "a government agent [may not] gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust." 898 F.2d at 115 (quoting *ESM Government Securities, Inc.,* 645 F.2d at 316).

In the case at bar, Gober did not use his status as a MID auditor to gain access to records that he had no right to inspect. On the contrary, Gober had every right to examine AJL's records, as

Mississippi law required Blocker to open AJL's files to Gober in order to stay in business. Further, the ATF agent in *Bosse,* who was allegedly responsible for the warrant, was not authorized to conduct a state inspection. To that end, Bosse could have excluded the ATF agent from his shop had he wanted. Here, neither AJL nor Blocker could have prevented an audit by MID, even if they were expressly informed by MID that if the audit uncovered evidence of any criminal activity, the auditor would report it to the authorities.[10]

For similar reasons, *Tweel* does not support Blocker's argument. In *Tweel,* the Organized Crime and Racketeering Section of the Department of Justice (DOJ) specifically requested the Internal Revenue Service (IRS) to conduct an audit of defendant Tweel. To discover whether his client was involved in a criminal investigation, Tweel's accountant asked the IRS agent whether a "special agent" was involved in the investigation, to which the IRS agent replied that there was not. Believing that the IRS was conducting only a routine civil audit, Tweel voluntarily presented his tax records to the IRS agent. The agent, in turn, created microfilm copies of the records and handed them over to the DOJ. The *Tweel* court, in determining that the IRS agent's deception amounted to a Fourth Amendment violation, recognized that although the IRS agent had no affirmative duty to warn Tweel that the investigation might result in criminal charges, the agent could not intentionally mislead Tweel. 550 F.2d at 299-300; *see also ESM Government Securities,* 645 F.2d at 315.

In this case, not only has Blocker failed to demonstrate that either he or AJL was ever intentionally or knowingly misled about the purpose of Gober's audit,[11] he has failed to show that either he or AJL was misled at all. At all times relevant, Blocker and AJL were under the impression that Gober was conducting a regular triennial MID audit—which is precisely what Gober was doing

---

[10]The *Bosse* court also found important the fact that the ATF agent accompanied the state inspection agent "not for the purpose of assisting in the state licensing inspection, but rather to further [his own] investigation into possible federal firearms violations." *Id.* at 115. Here, the limited purpose of Gober's inspection was to conduct a state insurance audit.

[11]*Tweel* requires defendants to bear the burden of showing that an IRS agent abused the public's trust by "materially misrepresent[ing] the nature of the inquiry." 550 F.2d at 299 (quoting *United States v. Prudden,* 424 F.2d 1021 (5th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); *see also United States v. Caldwell,* 820 F.2d 1395, 1399 (5th Cir.1987) (requiring a defendant to "show by *clear and convincing* evidence that the IRS agents made *material* misrepresentations about the nature of the inquiry") (emphasis in original).

and did.  There was no deception or misrepresentation to Blocker or AJL as to the scope or purpose of the audit.  In *Tweel* there was *no* genuine civil audit of the kind represented;  the only audit was a criminal audit specially ordered for this particular taxpayer, and falsely represented as a routine civil audit.  *See id.* at 298 ("what [IRS agent] Miller did not disclose was that this audit was not a routine civil audit to which any taxpayer may be subjected from time to time.  This audit was conducted at the specific request of the Organized Crime and Racketeering Section of the Department of Justice").  Here, Gober's audit *was* an MID audit, and it would have been conducted of AJL by Gober at the same time, for the same purpose, in the same manner and to the same extent, if the FBI had had no involvement.  The FBI did not bring about the audit or anything done or discovered therein;  all that was pure MID.

As discussed at length above, Gober at no point exceeded the scope of his authority under the Mississippi statute, as he examined only those records that his state inspection powers allowed and only those that he would have examined had the FBI not been involved.  In sum, we conclude that Gober's audit of AJL's records did not violate AJL's or Blocker's rights under the Fourth Amendment.  MID had a right to make its triennial audit of AJL, and it did so through Gober, who was unquestionably its legitimate agent for that purpose;  Gober looked for, looked at, and discovered *only* that which was appropriate for his MID audit and which he would and should have anyway in the course of his MID audit had there been no FBI involvement.  Neither AJL's nor Blocker's reasonable expectations of privacy were invaded by Gober's audit or what was discovered in the course thereof.  Thus, the district court correctly denied Blocker's motion to suppress.

II. SUFFICIENCY OF THE EVIDENCE

Blocker next argues that the evidence is insufficient to sustain his convictions for mail fraud and bank fraud.  We review challenges to the sufficiency of the evidence to determine whether a rational trier of fact could have found that the Government proved the essential elements of the offense charged beyond a reasonable doubt.  *United States v. Jimenez,* 77 F.3d 95, 97 (5th Cir.1996).  All the evidence admitted at the trial must be viewed in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences that tend to support the verdict.  *Id.*

## A. MAIL FRAUD

To prove a violation of the mail fraud statute, 18 U.S.C. § 1341, the Government must prove beyond a reasonable doubt that there was (1) a scheme or artifice to defraud, (2) specific intent to commit fraud, and (3) use of the mails for the purpose of executing the scheme to defraud. *United States v. Shively,* 927 F.2d 804, 813-14 (5th Cir.), *cert. denied,* 501 U.S. 1209, 111 S.Ct. 2806, 115 L.Ed.2d 979 (1991). In regard to the third element, Blocker stipulated at trial that all of the documents named in the mail fraud counts (1-18) were sent through the United States mail.

As previously set forth, Blocker and White were charged with aiding and abetting each other in defrauding the policyholders, investors, shareholders, and regulatory agencies of the Andrew Jackson Group of Insurance Companies: AJL (owned by Blocker); Andrew Jackson General Insurance Company; and Andrew Jackson Casualty Insurance Company. The indictment charged that Blocker and White engaged in deceptive practices to continue to receive insurance premiums and investments at a time when the companies involved were insolvent or impaired. This Court has recognized that a defendant commits fraud when he makes a company appear solvent when it is not. *Howell Hydrocarbons, Inc. v. Adams,* 897 F.2d 183, 192 (5th Cir.1990).

More specifically, the Government's theory was that the false information in the various letters and brochures that were mailed helped to bring in money from the policyholders and investors, who would not have sent the money had they known the precarious financial situation of the Andrew Jackson Group. Further, the Government's theory was that mailing the quarterly financial statements that contained false information was an effort to avoid regulatory action, thereby allowing the companies to continue collecting premium income from the policyholders. Blocker argues that the Government did not present sufficient evidence to allow a reasonable jury to find that AJL was insolvent.

The Government introduced overwhelming evidence showing that Blocker and White structured transactions and shifted assets among the companies to make AJL appear to have surplus capital when, in fact, AJL was in such hazardous financial condition that MID placed it on the "first priority" list to be examined. Viewed in the light most favorable to the verdict, the evidence showed

that Blocker and White were engaged in a scheme that involved the diversions of millions of dollars in premiums and income from the insurance companies to two high risk companies. Approximately forty million dollars were diverted to Southern Capital Holdings (SCH), a telecommunications venture, and Belwood, a furniture manufacturing company that was bought out of bankruptcy. These two companies received funds from the insurance companies through other White-owned companies such as Guardian Trust, a depository institution that held the monies of the three insurance companies in exchange for promises to pay.

Most all the funds held by Guardian Trust originated from insurance company deposits. Guardian Trust then invested in Acceptance Corporation. In return for the deposits or investments, Acceptance Corporation gave Guardian Trust an open-ended note receivable. Acceptance Corporation in turn loaned money to Andrew Jackson Corporation in exchange for a promissory note. Ultimately, Andrew Jackson Corporation loaned money to Belwood and SCH. Belwood and SCH never repaid any of the debts with their own money. Those two companies had to service their debts by borrowing more money to make interest payments that came due.

Although AJL's records reflected that it had money in demand accounts with Guardian Trust, the evidence established that cash monies did not support the journal entries. Jimmy Blissett, the chief examiner for MID, testified that Blocker admitted to him that AJL's demand account at Guardian Trust could not be liquidated. That demand account was supposed to be AJL's most liquid investment.

The Government also introduced overwhelming evidence that the companies and their investments were interdependent. As previously set forth, in 1990, MID informed Blocker and White that there was a problem with the affiliation among the White-owned companies and their interdependent investments. Blocker purchased AJL after MID voiced its concern regarding the affiliation problem. Even after Blocker's purchase of AJL, the accounting entries for the companies (including AJL) remained at the same physical location, and the companies were treated essentially as if there was one operation. Indeed, Blocker ran the operation by instituting a cash management system that he described as a "one-company concept."

At Blocker's direction, in March 1991, payment of the insurance policyholders' claims were delayed because of a cash crunch. Lou Pearce, secretary-treasurer at Guardian Trust, described the financial situation as follows:

> "I don't specifically know which checks were held, but I know we withheld some checks at Mr. Blocker's direction. I would tell him what we had to pay. Each morning I would go to his office and we'd go over the needs for the day, of the requests that had been made, and we would disburse what we had to, depending on what we had in the bank and how urgent those needs were."

Pearce further testified that the "three insurance companies and some other various companies, all their money would go into what we call CI or demand accounts." "All the money from the insurance companies went into Guardian Trust Company. They in turn disbursed the money out as it was needed to whomever." For example, SCH would request particular amounts of cash or venture capital, and Blocker would approve the disbursements. During October of 1991, the following disbursements of cash were made to SCH: $110,000 on October 7; $90,000 on October 11; $70,000 on October 14; $709,000 on October 21; $208,000 on October 25; and $405,000 on October 28.

Richard Newman, a securities analyst at the Securities Valuation Office at the NAIC, testified that his 1991 evaluation "determined that the holdings of [Belwood and SCH] were severely impaired and that as a result of this impairment it worked its way through the entire holding company structure of all of these companies and impacted them all." In other words, "these companies didn't have any equity."

Further, at the end of January 1992, which was prior to the FBI search, Blocker, when questioned regarding the financial status of the companies, responded "it's over with" and admitted that he was out of options. Thus, despite Blocker's arguments to the contrary, there was sufficient evidence to believe that AJL and the other insurance companies were impaired or insolvent as a result of the diversion of the insurance premiums to SCH and Belwood.

Blocker next argues that the Government failed to prove that he intended to defraud. "Intent to defraud requires an intent to (1) deceive, and (2) cause some harm to result from the deceit." *Jimenez,* 77 F.3d at 97 (citation omitted). A defendant has the intent to defraud if he acts knowingly

with the specific intent to deceive for the purpose of causing pecuniary "loss to another or bringing about some financial gain to himself." *Id.* Blocker contends that because there was no proof of insolvency, there can be no proof that he knew of the insolvency. Blocker's contention fails because, as stated above, there is sufficient proof that the companies were insolvent. Moreover, Blocker's extensive knowledge of these companies as an accountant and his control over day-to-day operations provided a sufficient basis from which a reasonable juror could infer his intent to defraud.

The counts of convictions for mail fraud are based on mailing the following: advertising in the form of letters and brochures to policyholders and investors; annuity contracts; an annual report to a shareholder; and quarterly statements to agencies of various states responsible for regulating the insurance industry.

In regard to counts 1, 5, and 6, the brochures provided, among other things, that one of the company's greatest strengths was its investment results and that its holdings were investment grade and that its bonds were rated by the NAIC and found acceptable by various departments. One letter promised "100% guarantee" on the investment.[12] Another letter provided as follows: "Our 130 million dollars in assets are primarily invested in Mississippi companies with a long track record of profitability." There was ample evidence showing that these representations were false and misleading. We hold that the evidence clearly is sufficient to sustain the convictions based on the mailings to the policyholders.

In regard to the counts (2-4, 7-12, 15-17) of conviction based on the mailing of the quarterly statements to the various state regulators, Wanda Smith, a CPA who was an accountant for AJL, testified that she prepared the 1991 quarterly statements. She further testified that millions of dollars in assets that were listed as performing on the quarterly statements were actually not performing, *i.e.,*

---

[12]Blocker argues that he had nothing to do with the advertising campaign and that he had no knowledge of the letters because his signature on the letters was computer-generated. This argument will afford him no relief. John Gough, who had been an officer and director of several of the White-owned companies, testified that he heard Blocker "tell John Bethany to get the advertising program cranked up." He also testified that Blocker was present at meetings in which the advertising campaign was discussed in the context of attempting to revive the insurance companies. The jury was free to reject Blocker's testimony that he had no knowledge of his signature being used.

not generating income. Additionally, the statements did not provide that a $200,000 dividend ($50,000 each quarter) had been declared to Blocker. The evidence is sufficient to sustain Blocker's convictions for defrauding the state regulators.

To sustain the convictions in counts 13 and 14 based on the mailing of the annuity contracts to John Burris and James Moulds, the Government argues that Burris and Moulds purchased those contracts in reliance on advertisements in December 1991. However, in the court below the Government argued that those two counts did not "have anything to do with the mailout that occurred in December." Further, in response to the district court's inquiry regarding the Government's theory of the case on those counts, the Government responded that the mails were used to deliver the annuity contracts at a time when Blocker should not have been seeking business.[13] In any event, our recent opinion in *United States v. Krenning,* 93 F.3d 1257 (5th Cir.1996) is controlling with respect to counts 13 and 14. There, under similar circumstances, we affirmed a mail fraud conviction reasoning that "[w]ithout these mailings to the insureds, ... the Defendants would ... not have been able to continue selling worthless insurance policies, the financial object of their scheme." *Id.* at 1263. We therefore concluded that there was sufficient evidence to allow the jury to find that the mailings were in furtherance of the defendants' scheme to defraud. Likewise, in the case at bar, the annuity contracts were necessary and directly related to the procurement of additional funds with which to continue the fraudulent scheme. We must conclude that the evidence was sufficient to show that mailings of the contracts were in furtherance of Blocker's scheme to defraud.

On the other hand, we find the evidence insufficient to sustain count 18, which is based on the mailing of the 1990 annual report of AJL to Susan Allenburger (White's sister) and her husband, David Allenburger. To support that conviction, the Government argues that the 1990 annual report

---

[13]The Government also made the following argument to the district court:

> "It's the rest of the scheme dealing with misrepresenting the true value—misrepresenting the financial condition of the companies and ultimately goes back to the quarterly statements. They mailed out quarterly statements that allowed them to continue to remain in business to do things like the annuity contract. The theory of the prosecution is not just the December 6th mailing. It's a lot of other mailings."

"painted a rosy picture of the companies in which Allenburger had an interest" even though Blocker knew it was false. The Government, however, does not specify the false information contained in the report, and we have been unable to determine from the record what specific evidence was false or fraudulent. We find the Government's theory too tenuous to sustain the conviction based on the mailing of AJL's 1990 annual report. We therefore must conclude that the evidence is insufficient to sustain the fraud conviction based on the mailing of the 1990 annual report.

## B. BANK FRAUD

Blocker also argues that the evidence is insufficient to prove his two convictions for bank fraud. To prove a violation of the bank fraud statute, 18 U.S.C. § 1014, the Government must prove beyond a reasonable doubt that the defendant: "(1) made a "false statement or report' and (2) did so "for the purpose of influencing in any way the action of' a federally insured institution engaged in a lending activity." *United States v. McDow,* 27 F.3d 132, 135 (5th Cir.1994) (quoting *United States v. Bowman,* 783 F.2d 1192, 1197 (5th Cir.1986)).

Blocker was charged with aiding and abetting White in the two counts of bank fraud. To uphold a conviction for aiding and abetting under 18 U.S.C. § 2, the Government must prove that the defendant associated with a criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture successful. *United States v. Polk,* 56 F.3d 613, 620 (5th Cir.1995) (citations omitted). A defendant associates with the criminal venture if he shares in the criminal intent of the principal. *United States v. Jaramillo,* 42 F.3d 920, 923 (5th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 2014, 131 L.Ed.2d 1013 (1995). A defendant participates in the criminal activity if he has acted in some affirmative manner designed to aid the venture. *Id.* Mere presence and association are insufficient to sustain a conviction for aiding and abetting. *Jaramillo,* 42 F.3d at 923.

Count 19 of the indictment charged Blocker with aiding and abetting White in submitting White's personal financial statement that contained false information to the Bank of the South for the purpose of obtaining a $100,000 loan in December 1991. White's financial statement provided that he owned $15,629,264 in stock in Guardian Trust Company and Andrew Jackson Corporation. The

testimony at trial, however, indicated that the stockholders' equity in those two corporations was "a negative number."[14]

Blocker argues that the loan was a personal loan for Dan White and that he cannot be held responsible for the information in the financial statement. The Government introduced the following evidence that demonstrated that Blocker aided and abetted White in committing fraud against the Bank of the South. Blocker submitted the loan application to the president of Bank of the South, Ralph Olier. Blocker requested the loan explaining that "they" had a cash flow problem and needed some short-term help. Belwood received the proceeds of that loan. Olier testified that Blocker was required to guarantee the loan because Blocker was "a participant or part of the flow from J. Dan White and Mr. Blocker to Mr. Connerly [manager of Belwood]." Moreover, the evidence was sufficient for the jury to infer that Blocker was aware of the misrepresentation contained in White's statement[15] and that he intended to further the criminal venture, *i.e.,* making a false statement for the purpose of influencing the bank's decision to make the loan. Under those circumstances, we do not hesitate to find that Blocker aided and abetted White in committing bank fraud. The evidence is sufficient to uphold Blocker's conviction on count 19.

Count 20 of the indictment charged Blocker with aiding and abetting White in falsely representing to First National Bank of Vicksburg that the "mortgage loan between Belwood and [AJL] and Guardian Trust was paid current with a history of regular and timely payments, when in truth and fact the payments shown the bank were only bookkeeping journal entries made to create an appearance of a non-default status, which entries, as the Defendants well knew, were unsupported by actual cash payments." Blocker used Belwood's mortgage as collateral to secure a $2,000,000 loan for AJL.

---

[14]Blocker argues that the financial statement provides that the investments are listed at its "book" value rather than the "actual value." The evidence at trial demonstrated beyond a reasonable doubt that the value of White's investments was so diminished that this figure falsely represented his holdings and could only be asserted in an attempt to mislead and deceive. The representation of value when no value exists is fraudulent.

[15]Indeed, on cross examination, Blocker admitted that he knew "something about [White's financial statement]."

At trial, the commercial lender who handled the loan testified that the only representation made regarding the Belwood mortgage was that it was current. Blocker introduced checks written by Belwood indicating that it was current on its mortgage payments. Blocker argues therefore that the evidence did not establish that the payments were only journal entries. The Government responds that "[t]he documents presented to the banks did not include how worthless the listed assets were. Assets were claimed to be paid in a current manner when they were not, the Belwood and SCH loans were supported only by additional borrowing and no real cash."

Our review of the record indicates that Belwood paid the mortgage payments and that the mortgage was current. Although it is true that Belwood had to borrow the money to make the mortgage payments, we are not prepared to hold that having to borrow the money renders the representation that the mortgage was current false. Accordingly, we reverse Blocker's conviction on count 20.

## III. JURY INSTRUCTION

Blocker argues that the district court erred in failing to instruct and submit the issue of "materiality" on counts 19 and 20, the bank fraud counts. Because we reversed Blocker's conviction on count 20, we need reach this claim only in regard to count 19.

At the time of trial, this Circuit's precedent dictated that materiality under 18 U.S.C. § 1014 was a legal determination to be made by the district court, notwithstanding that we also recognized that materiality of a false statement was an element of the offense which the Government was required to prove. *United States v. Williams,* 12 F.3d 452, 456 (5th Cir.1994); *United States v. Thompson,* 811 F.2d 841, 843 (5th Cir.1987). In accordance with that precedent, the district court instructed Blocker's jury that it "need not consider whether the false statement was a material false statement, even though ... that language is used in the indictment. That is not a question for the jury to decide." Subsequently, the Supreme Court held that materiality, an element of the offense, must be submitted to the jury to be found beyond a reasonable doubt. *United States v. Gaudin,* --- U.S. ----, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

Both Blocker and the Government argue that this claim should be reviewed for plain error.

We have previously reviewed unobjected to *Gaudin*-error claims for plain error. *United States v. Upton,* 91 F.3d 677, 685-86 (5th Cir.1996); *United States v. Jobe,* 101 F.3d 1046 (5th Cir.1996). We therefore will review the claim for plain error.

Under Fed.R.Crim.P. 52(b), this Court may correct forfeited errors only when the appellant shows the following factors: (1) there is an error, (2) that is clear or obvious, and (3) that affects his substantial rights. *United States v. Calverley,* 37 F.3d 160, 162-64 (5th Cir.1994) (en banc) (citing *United States v. Olano,* 507 U.S. 725, 730-37, 113 S.Ct. 1770, 1776-79, 123 L.Ed.2d 508 (1993)), *cert. denied,* --- U.S. ----, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995). If these factors are established, the decision to correct the forfeited error is within the sound discretion of the court, and the court will not exercise that discretion unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Olano,* 507 U.S. at 734-36, 113 S.Ct. at 1778. As this Court did in *Upton, supra,* in the instant case we will assume that the first three factors of the *Olano* test have been satisfied.

As set forth previously, count 19 is based upon the false statement in Dan White's financial statement. "A false statement is material if it is shown to be capable of influencing a decision of the institution to which it was made." *Williams,* 12 F.3d at 456. Ralph Olier, president of Bank of the South, testified that Bank of the South requested White's current financial statement to obtain the "most accurate information on Mr. White." Olier further testified that Bank of the South relied on, among other things, White's financial statement when it approved the loan. There apparently was no argument before the district court that the financial statement, if false, was not offered to influence Bank of the South to loan $100,000. It could hardly be suggested that a financial statement of the borrower would not be material to the decision to loan such a large sum of money. Indeed, Blocker does not now argue that the financial statement was not material, only that the issue should have been submitted to the jury.

In light of the record presented to us in this appeal, we cannot say that the *Gaudin* error affected the fairness, integrity, or public reputation of these proceedings. Under these circumstances, we will not exercise our discretion to correct the error in Blocker's conviction. *Upton,* 91 F.3d at

686.

## IV. SENTENCING ISSUES

## A. CALCULATION OF AMOUNT OF LOSS

Blocker challenges the district court's estimate of the amount of loss caused by the offense conduct. He contends that he was not charged with rendering AJL insolvent but rather, he was charged with operating AJL after it was already insolvent in such a way that would allow AJL to continue to collect premiums from the policyholders. He argues that "the correct calculation for the amount of loss would be whatever increased loss, if any, was caused by the continued operation of [AJL] beyond the point it should have been closed down by state regulators." In other words, "this would be the amount of actual loss at the time it was closed down less the amount of loss that would have occurred if at the time the state regulators would have closed down [AJL] in the absence of [his] alleged scheme to defraud."

Blocker challenges neither the loss estimate of $39,000,000 nor the district court's use of "actual" loss. Instead, he argues that he is responsible for only part of that loss. Although he lists certain monies he asserts should have been subtracted from the $39,000,000 figure, he does not offer any calculation or the precise amount of loss to be attributed to his offense conduct. In the district court, defense counsel informed the district court that his "overall position is there is no way you can determine what the actual number is today." Defense counsel further stated that "[i]t's our position we don't know—That's not an accurate number. We don't know what it is."

After hearing arguments of counsel, the court found as follows.

"It appears clear to the court that the loss is in excess of 20 million dollars,[16] so that issue is resolved against the defendant. The court will make a finding that the loss is approximately 39 million dollars, realizing that oftentimes the precise number is impossible to determine; but a very competent CPA has given his attention to it, and study, and reached the conclusion that that is the approximate amount; and the court will adopt that." (footnote added).

Similarly, in *United States v. Stedman,* 69 F.3d 737, 740-741 (5th Cir.1995), the appellants argued that the amount of loss should be only the part for which their offense conduct was the cause

---

[16]If the amount of loss for fraud was in excess of $20,000,000, but less than $40,000,000, the increase in the offense level remains the same. § 2F1.1(b)(1)(Q) and (R).

because the bank was in financial trouble before they concealed information. They asserted some of the loss was unavoidable. This Court rejected the defendant's argument, opining that "[t]he impracticability of the course urged by [the appellants] is perhaps best demonstrated by their inability to offer a reasonable figure for the loss." We explained that "[r]ealistically, no one can assess such a thing precisely; and we refuse to ask sentencing courts to undertake such Herculean tasks or to afford the benefit of the doubt to bank officers who engage in wrongful conduct." *Id.*

Likewise, in light of Blocker's inability to offer a precise amount of loss and the evidence to support the district court's finding of loss, we find no error.

## B. JEOPARDIZING SOUNDNESS OF FINANCIAL INSTITUTION

Blocker contends that the district court erred in increasing his offense level by four pursuant to § 2F1.1(b)(6)(A), which provides for a such an enhancement if the defendant's offense substantially jeopardized the safety and soundness of a financial institution.[17] Blocker argues that this guideline is inapplicable because the Government's case was posited on the theory that he knew that AJL was statutorily impaired and insolvent when he took it over in 1989. He therefore argues that if AJL already was insolvent, the scheme to forestall regulatory action in order to continue operations could not have caused its insolvency. After examining the commentary to § 2F1.1, we are unpersuaded by Blocker's argument.

The commentary to § 2F1.1 explains that an offense shall be deemed to have substantially jeopardized the safety and soundness of a financial institution:

> "if, as a consequence of the offense, [1] the institution became insolvent; [2] substantially reduced benefits to pensioners or insureds; [3] was unable on demand to refund fully any deposit, payment, or investment; [4] was so depleted of its assets as to be forced to merge with another institution in order to continue active operations; or was placed in substantial jeopardy of any of the above." U.S.S.G. § 2F1.1, comment. (n.15).

At the sentencing hearing, the district court found that:

> "There is no question Mr. Blocker's offense behavior resulted in the ultimate downfall of AJL and the subsequent need to place the company in rehabilitation and finally liquidation. It is clear from investigative information that not only was AJL rendered insolvent but was also

---

[17]Section 2F1.1(b)(6)(A) provides that "[i]f the offense substantially jeopardized the safety and soundness of a financial institution ... increase by four levels. If the resulting offense level is less than level 24 increase to level 24."

unable on demand to refund fully any deposit or investment and was also so depleted of assets as to be forced to merge with another institution."

Clearly, under those facts, § 2F1.1(b)(6)(A) is applicable. Because Blocker has not shown that these findings are clearly erroneous, his claim fails.

C. RESTITUTION

Blocker contends that he lacks the future ability to pay restitution in the amount of $5,708,051 as ordered by the district court. He argues that the district "court made no findings as to [his] present or future ability to pay this amount."

A district court's order imposing restitution is reviewed for abuse of discretion. *United States v. St. Gelais,* 952 F.2d 90, 97 (5th Cir.), 506 U.S. 965, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992). We have held that a defendant's indigency is not a bar to the district court ordering restitution. *United States v. Ryan,* 874 F.2d 1052, 1054 (5th Cir.1989). Under 18 U.S.C. § 3663, a district court shall consider the amount of loss sustained by the victims as a consequence of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant, and any dependent of the defendant. The court need not make specific findings, however, if the record provides an adequate basis to support the restitution order. *St. Gelais,* 952 F.2d at 97.

During the sentencing hearing, the district court expressly stated that it had considered the loss sustained by the victims, Blocker's financial resources as listed in the presentence report, and Blocker's financial needs. The court then concluded that Blocker did not have the ability to pay a fine and full restitution. The court therefore did not impose a fine but imposed partial restitution in the amount of $5,708,051.

The record provides an adequate basis for the district court's decision. The presentence report provides that Blocker has a degree in accounting and no dependents. Additionally, the report provided that Blocker "stated on the personal financial statement that, conceivably, if he is able to work, and does not go to jail, he could earn approximately $100,000 annually for these services." Because the district court considered the factors set forth in the statute and the record supports the court's findings, Blocker has not shown that the district court abused his discretion in imposing partial restitution.

## V. CONCLUSION

For the foregoing reasons, we REVERSE Blocker's convictions on count 18 and 20 and AFFIRM the convictions on counts 1-17 and 19 and AFFIRM Blocker's sentence.[18]

BENAVIDES, Circuit Judge, concurring in part and dissenting in part:

I dissent only from the majority's decision to affirm the district court's denial of Blocker's motion to suppress.

My view of this case can be summarized as follows: (1) Gober was an agent of the FBI; (2) Gober searched AJL's records; (3) the FBI needs a warrant or an exception to the warrant requirement to search; and (4) there was no warrant and no exception was available to the FBI because Blocker's implied consent to search under the Mississippi administrative scheme did not encompass an FBI agent desirous of finding criminal activity. As a result, the Fourth Amendment was violated, and the error was not harmless.

Blocker contends that Gober was acting as an agent of the FBI when Gober gathered the evidence that resulted in his prosecution. As set forth by the majority, to make such a determination, this Court, in the past few years, has assumed the adequacy of a test formulated by the Ninth Circuit in *United States v. Miller,* 688 F.2d 652, 657 (9th Cir.1982): (1) whether the Government knew of or acquiesced in the intrusive conduct; and (2) whether the private party intended to assist law enforcement efforts or to further his own ends. *E.g., United States v. Jenkins,* 46 F.3d 447, 460 (5th Cir.1995). Prior to applying the *Miller* test, this Court had opined that "[p]reknowledge and acquiescence [of the government] make a search by a private party a search by the government." *United States v. Clegg,* 509 F.2d 605, 609 (5th Cir.1975). Thus, "[a]ny evidence which, for Fourth Amendment reasons, would have been excluded had it been gathered by the government *pro se* would, of course, have to be excluded if gathered by the only nominally private party." *Id.* We explained that the evidence would be excluded to deter the Government from knowingly using a private party to do that what it is prohibited from doing. *Id.*

---

[18]All the sentences were concurrent and nothing indicates that the convictions on counts 18 and 20 affected the sentences or the guideline ranges on the other counts.

In the case at bar, the district court did not cite the above case law or any other authority in its discussion regarding whether Gober was an agent of the FBI. The district court did opine, however, that the following facts were most important to its conclusion that Gober was not an agent:

> Gober was counseled that he was to conduct his examination as he always had; that is, it was emphasized that he was to do precisely that which he would do in the normal course of any examination, nothing more, nothing less and nothing different. And Gober testified credibly that the fact of his relationship with the FBI did not influence the course of his examination or affect the form of his examination. He conducted his examinations the same way after he commenced his relationship with the FBI as he had before. In Gober's words, his examination "would have been no different whatsoever" had he not been involved with the FBI. Indeed, there is no proof that Gober ever went beyond that which was necessary for an administrative examination of Andrew Jackson Life's financial condition. Gober and Agent Breedlove also testified quite convincingly that no one with the FBI or the United States Attorney's office ever directed Gober as to what to do. They never told him what to look for or what they hoped to find. In fact, they never even told Gober what their investigation might concern, or what they might be interested in. Further, it is uncontroverted that Gober received his assignments from the MID and neither he, nor the FBI or United States Attorney's office had any control in directing him to any particular company, including Andrew Jackson Life. Finally, though Gober received compensation from the FBI, it is clear that the compensation was for his time away from work and from his family, and not for his "services" or for the information he provided.

The district court's conclusion that Gober was not an agent is largely based on the finding that Gober's actions were not directed or influenced by the FBI. Simply because he conducted the examination as he always had does not answer the question at issue.[1] The relevant inquiry is (1) whether the Government knew of or acquiesced in the intrusive conduct; and (2) whether the private party intended to assist law enforcement efforts or to further his own ends.

In regard to the first factor, the evidence at the hearing established that, prior to examining the records of AJL, Gober contacted the Government and agreed to provide any evidence of criminal activity he discovered. Thus, it is clear that the Government knew about the intrusive conduct, *i.e.,* the examination of the insurance company's records. Indeed, the district court found that "Gober agreed [with the Government] that if he were to again encounter what he believed to be evidence of criminal conduct by Mississippi insurers or MID, he would furnish such information to the FBI." As such, the Government knew of and acquiesced in the intrusive conduct.

The next question is whether Gober intended to assist law enforcement efforts or to further

---

[1]If the FBI had directed Gober's actions, he undoubtedly would have been acting as an agent of the FBI.

his own ends.  In regard to this factor, the district court made findings that would support either conclusion.  The district court found that "from the beginning of their [Agent Breedlove and Gober's] relationship, Gober was desirous of providing the FBI with any evidence of criminal activity which he might uncover during the course of his examinations and, in fact, that is what he agreed to do."  This finding unquestionably indicates that Gober intended to assist law enforcement efforts.  However, the district court also found that "Gober's purpose at Andrew Jackson Life was not to search for evidence of criminal activity, either as an agent of the state government or the federal government.  Instead, his purpose was to perform a financial examination of AJL in his capacity as an examiner for MID, and that is precisely what he did."  Curiously, the court found that Gober desired to (and agreed to) provide the FBI with any evidence of criminal activity discovered during the examination but that his purpose was not to search for evidence of criminal activity.[2]

After a careful review of the suppression hearing, it is clear that Gober both intended to assist law enforcement *and* further his own interests.  Gober testified regarding how he "would repeatedly try to get [the FBI agents] to make comments or offer direction."  Indeed, he became frustrated after the agents refused to offer him the requested guidance.  Additionally, Gober candidly admitted that, at the time he was conducting the examination of AJL and its affiliates, although he did not know whether the Government later would hire him as a contract employee, he "was hoping that" would happen.[3]  Though part of Gober's motivation in reporting the alleged criminal activity was to shield himself from any allegations of wrongdoing, *see* maj. op. at 1576, his actions went far beyond that.

---

[2]In a footnote, the district court sought to clarify this finding, opining that Gober did not agree to "look for" evidence but agreed only that he would continue to provide information discovered during his examinations that might suggest criminal activity.

[3]Gober was no longer employed by MID after the search warrant was executed on February 7, 1992.  Indeed, three days after the search warrant was executed, Gober began working as a contract employee for the FBI.  Subsequent to that date, the FBI paid Gober a total of $35,000 "to analyze documents, review documents as it relates to insurance accounting."  At the end of his contract with the FBI, according to Gober, he "met with the U.S. Attorney's office and offered services to them to—[he] had previously with the FBI looked at documents to determine relevancy and so forth, and I was going to, if they needed me, assist the U.S. Attorney's office in continued analysis and explaining the relevancy of those documents to an insurance company's collapse."  Ultimately, Gober received $78,280 for the services he rendered to the United States Attorney from October 13, 1992 to May 6, 1994.  At the time of the suppression hearing, Gober still was providing services to the United States Attorney at the rate of $30 per hour.

In light of Gober's testimony, it is most apparent that he intended to help the FBI in their investigation.

In *United States v. Bazan,* 807 F.2d 1200, 1203 (5th Cir.1986), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987), this Court encountered a somewhat similar scenario involving mixed motives on the part of the alleged Government agent. In that case, the private party may have had a personal reason to conduct the search in addition to any desire he may have had to assist law enforcement officers. 807 F.2d at 1204. We determined that it was unnecessary to ascertain the private party's "true" motive for entering the ranch because "an informant's personal motive to conduct a search is not at all inconsistent with an intention to aid a police investigation." *Id.* We explained that when the Government does not offer "any form of compensation for [the informant's] efforts, personal motives in fact are likely to be mixed with the desire to help authorities." In conclusion, this Court held that when the Government has not offered any form of compensation, has not initiated the idea of searching, and lacked specific knowledge that the informant intended to search, the informant has not acted as a Government agent. *Id.* In the instant case, although the Government did not initiate the idea that Gober would conduct the search,[4] the Government had specific knowledge that Gober would conduct the search, and the Government compensated Gober for his time.

Our cases indicate that compensation is an important consideration in determining whether the private party became an agent of the Government. *See United States v. Ramirez,* 810 F.2d 1338, 1342 (5th Cir.), *cert. denied,* 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987); *Bazan,* 807 F.2d at 1204. In the case at bar, this factor is rather troublesome in that the district court found that "though Gober received compensation from the FBI, it is clear that the compensation was for his time away from work and from his family, and not for his "services' or for the information he provided."

---

[4]The fact that the Government did not *initiate* the contact with Gober does not preclude the determination that Gober was acting as an agent of the United States Government. "[I]t is "immaterial' whether the government originated the idea for a search or joined it while it was in progress. *United States v. Knoll,* 16 F.3d 1313, 1320 (2nd Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 574, 130 L.Ed.2d 490 (1994) (citing *Lustig v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949) (plurality)).

Nevertheless, it is undisputed that Gober received compensation from the Government. The broad language in *Bazan* that "the government has not offered the informant any form of compensation for his efforts" could be read to mean that any form of compensation (whether for services or not) would be sufficient to weigh as a factor in favor of the conclusion that the party was acting as an agent.[5] In any event, in light of the evidence adduced at the hearing, I am persuaded that the court's finding that Gober was not compensated for his services or for the information he provided is clearly erroneous.

The evidence established that Gober received $4,891[6] from the FBI for his time spent prior to February 7, 1992, the date the search warrant was executed. Gober testified that this money was not for "services," but rather for his "time." Gober explained as follows:

> Prior to February 7 any amounts that I received—I think "services" is an improper term. If I had to miss time from work as the investigation grew—there was more and more time needed of me. If I was asked to spend a great deal of time with them, I would say, "The only way can I [sic] do it and not be away from my family the whole time is for me to take a half day off from my work or take one day off." If I did so, I wasn't paid because, as you said earlier, I was on contract. So if I took a half day off, I would miss a half day's work. All they did was reimburse me for exactly what I missed by not being at work. It was—services, I guess, is the improper term.

The FBI paid Gober $37.50 an hour, which is precisely the rate he was paid for his contract work for MID. Although the district court found that Gober was paid for time away from work and from his family (and not for his services), there was no reason for the United States Government to pay $37.50 an hour to Gober, a contract employee of MID, but for the information and services that he provided the Government. Gober undoubtedly was compensated for his services and for the information he provided.

In sum, the evidence clearly demonstrates that Gober intended to assist law enforcement, was

---

[5]Of course, the Government may pay, for example, a witness's expenses incurred in traveling to testify, and such compensation would not be a factor in determining whether the person was an agent of the Government.

[6]The district court stated that Gober was paid approximately $4100. During the hearing, Agent Breedlove initially estimated that Gober had been paid $4100 for his time prior to February 7, 1992. After looking at the FBI receipts, however, Agent Breedlove corrected his testimony and stated that the figure was $4,891. Gober also testified that he received approximately $4,800 from the FBI for that time period.

compensated for his time spent providing the Government with evidence, and the Government knew of and acquiesced in the search.[7]  In fact, the FBI most certainly encouraged Gober by providing him with a device for the surreptitious recording of conversations he had with Blocker.  And Gober recorded all conversations to satisfy the Government's concerns regarding allegations of selective recording.  The Government should "not be permitted to stand by or blink their eyes and accept the benefit" of Gober's activities.  *United States v. Mekjian,* 505 F.2d 1320, 1328 (5th Cir.1975) (explaining that the evidence was admissible because the Government had not encouraged or cooperated with the private individual conducting the search).  Based on this Circuit's precedent and the factors employed by the Ninth Circuit in *Miller,*[8] I conclude that Gober was acting as an agent of the Government.[9]

On the other hand, the majority opines "that [w]e need not decide whether Gober was acting as an agent of the Federal Government because even assuming, *arguendo,* that Gober was not only an agent of MID but was also acting on behalf of the FBI, we believe that no Fourth Amendment violation occurred as Gober's inspection did not intrude upon any reasonable expectation of privacy that AJL or Blocker might have had in AJL's records."  Maj. op. at 1579-80.[10]  Although the majority

---

[7]Indeed, the district court found that Gober had a preexisting cooperative relationship with the Government, and, as set forth previously, the Government had actual knowledge that Gober was searching AJL's records and furnishing evidence to the FBI.

[8]I note that whether the *Miller* test or our earlier precedent, *Clegg, supra,* is used, I come to the same conclusion that Gober was acting as an agent of the Government.

[9]Although admittedly an appellant has a difficult burden of showing that the district court clearly erred, it is not insurmountable.  *See Jenkins,* 46 F.3d at 460 (holding that the district court clearly erred in finding that the private party was acting as an agent of the Government).

[10]The majority opines that the district court's conclusion that Gober was not a Government agent is "arguably implicit."  Maj. op. at 1579.  I do not read the district court's conclusion that Gober was not an agent of the Federal Government to be implicit.  The Government acknowledges in its brief that the district court found that Gober was not an agent of the FBI.  The district court recognized that Blocker's "*primary contention* ... is that Gober operated in cooperation with, and *effectively as an agent for the FBI,* using his authority as a financial examiner for the MID as a pretext to gain entry to the premises of [AJL] and access to the financial documents of that company...."  (emphasis added).  The district court subsequently stated that it was "persuaded that Gober's purpose at [AJL] was not to search for evidence of criminal activity, either as an *agent of the state government or the federal government.*"  (emphasis added).  In any event, assuming it was an implicit conclusion, I would find it clearly erroneous.

expressly states that it does not determine whether Gober was acting as an agent of the FBI, it agrees "that the evidence establishes that the FBI knew of and acquiesced in Gober's audit of AJL's records and that Gober intended to assist the FBI in its law enforcement efforts." Maj. op. at 1579. That, of course, satisfies the *Miller* test that this Court has been applying to determine whether a person has acted as an agent of the Government.

Having determined that Gober was acting as an agent of the FBI, and recognizing that the Fourth Amendment applies to commercial premises, *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), I believe that Gober must either have a warrant to search AJL or an exception to the warrant requirement must apply. It is undisputed that Gober did not have a warrant. Instead, he was searching pursuant to an established exception to the warrant requirement for administrative inspections. By engaging in a business that is heavily regulated, Blocker "in effect consent[ed]" to the administrative inspection under this regulatory scheme. *Id.* at 313, 98 S.Ct. at 1821. The section of the scheme that supplied Gober authorization to search provided in pertinent part that "[t]he Commissioner of Insurance shall carefully examine the affairs of each domestic company as to its financial ability and condition as often as once in three (3) years.... Such examination shall be made by the *commissioner, or by his accredited representatives,* and such companies shall pay the proper charges incurred in such examination...." Miss.Code Ann. § 83-1-25 (emphasis added).[11] Clearly, the statute authorizes only the commissioner or his accredited representative to search AJL.[12] It does not authorize an FBI agent to do so. The Government offers

---

[11]Blocker does not challenge the validity of the Mississippi administrative scheme.

[12]The majority cites *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), for the proposition that, in certain circumstances, warrantless searches of commercial property may be reasonable under the Fourth Amendment. Those circumstances are not present here inasmuch as the statute in *Burger* specifically authorized police officers to conduct an administrative search. *Id.* at 694 n. 1, 107 S.Ct. at 2639 n. 1. Unlike in *Burger,* Blocker could not have "in effect" consented to an FBI agent's search of his business premises. If the Mississippi statute had so provided, then Blocker would have had the opportunity to challenge the statute as in *Burger* and *Barlow's.* As the Supreme Court explained, "the regulatory statute must perform the two basic functions of a warrant; it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Burger,* 482 U.S. at 703, 107 S.Ct. at 2644. "To perform this first function, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to

no other exception to the warrant requirement justifying an FBI agent's search.

Although Blocker consented to Gober's search as an accredited representative of the commissioner, he did not consent (impliedly or otherwise) to Gober's search as an FBI agent. I do not see this as breaking any new ground for the Fourth Amendment. Simply put, Gober exceeded the scope of the implied consent under the express language of the statute by allowing an agent of the FBI to search the records. Of course, as the majority emphasizes, the district court found that Gober's physical search of AJL would have been no different if Gober had not been an agent of the FBI. This analysis ignores, however, the district court's findings that from the beginning Gober was desirous of providing the FBI with any evidence of criminal activity and that Gober entered into an *agreement* with the FBI to turn over any such information that he encountered during his examination. In other words, Gober wore two hats.

In *United States v. Bosse,* 898 F.2d 113 (9th Cir.1990), the Ninth Circuit addressed an analogous Fourth Amendment claim. There, the defendant had an application pending for a state license to deal in automatic machine guns, and an agent of the California Department of Justice inspected the defendant's premises as part of the licensing process. Unbeknownst to the defendant, the person who accompanied the California state agent during the search was an Alcohol, Tobacco, and Firearms (ATF) agent. The only representation made regarding the ATF agent was when the state agent explained that the ATF agent "is with me." A search warrant was later obtained by the ATF apparently based on the ATF agent's observations during that search. The Ninth Circuit opined that "[a] ruse entry when the suspect is informed that the person seeking entry is a government agent but is misinformed as to the purpose for which the agent seeks entry cannot be justified by consent." *Bosse,* 898 F.2d at 115. The Ninth Circuit explained that the ATF agent's silence constituted a deliberate representation that his purpose was that declared by the California agent and a deliberate

periodic *inspections undertaken for specific purposes'." Id.* (quoting *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981)) (emphasis added). "In addition, it notifies the [business owner] as to *who* is authorized to conduct an inspection." *Burger,* 482 U.S. at 711, 107 S.Ct. at 2648 (emphasis added). In the case at bar, the statute did not inform Blocker that an FBI agent would search or that the FBI agent was desirous of finding evidence of criminal activity. Thus, the statute failed to perform its function as a warrant notifying the business owner *who* is searching and the inspector's *specific purpose.*

misrepresentation of his true purpose. Thus, the ATF's furtive entry into the defendant's home was illegal.

*Bosse* explains that a government agent is not permitted to "gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust." 898 F.2d at 115 (quoting *SEC v. ESM Government Securities, Inc.,* 645 F.2d 310, 316 (5th Cir.1981)). Yet that is exactly what happened in the case at bar. FBI Agent Gober gained access to Blocker's records by representing himself solely as an agent of MID. *Cf. United States v. Tweel,* 550 F.2d 297 (5th Cir.1977), (holding that the Fourth Amendment is violated when an administrative officer obtains consent to search by falsely representing that the evidence obtained will be used only in a civil investigation). The FBI should not be able to piggyback a criminal investigation onto an administrative search in order to accomplish what it otherwise would not be able to accomplish.

This case appears complicated by the fact that the person who had the statutory authority to search AJL's records and the person who was acting as an agent of the FBI were one and the same. I perceive that to be a distinction without a difference. For all intents and purposes, Gober brought an agent of the FBI with him to search AJL just as the state inspector covertly brought an ATF agent with him in *Bosse.* To me, the fact that the two agents were one and the same person as opposed to two separate individuals, if anything, makes the search more intrusive in that at least if two persons arrive to conduct a search, one would have some warning that there could be two persons from different agencies or dual purposes to the search. One might have some inkling that the scope of one's consent was exceeded and thus have the opportunity to respond accordingly.

I believe that insofar as Gober was acting as an FBI agent he broke the rule when he gained entry under the guise of state authority but had an objective not contemplated by Blocker. After gaining entry, the Government agent's actions must be limited to "the very purposes contemplated by the occupant." *Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966). I would not presume to think that Blocker had contemplated that Gober (who identified himself only as an agent of MID) had an agreement to turn over any incriminating evidence to the FBI

pursuant to a preexisting, cooperative relationship. The bottom line is that Gober was permitted to search based on Blocker's consent under the administrative statute, which does not authorize a search by the FBI. In my opinion, Blocker did not consent in any way, shape, or form to having an FBI agent search his place of business. Under these circumstances, Blocker had a reasonable expectation of privacy in the corporate records vis-a-vis Gober's relationship with the Federal Government.

The majority relies heavily on the fact that Gober, as an MID agent, was authorized to conduct the search and did not exceed the scope of his state authority. That is true. My analysis does not touch the search in regard to his state authority. That inspection was legal and the information properly passed on to MID. If MID had furnished the information to the FBI after it had been funneled through proper administrative channels, that would fall within the administrative search exception.[13] But that is not what happened. The administrative search exception does not allow the FBI to send one of its own agents with someone who has the authority to conduct an administrative search, which is effectively what happened here. The only search I consider illegal is the one that was conducted by Gober as a federal agent, the fruits of which were used to convict Blocker—that of course being the intended purpose of the FBI agent.

I believe that the controlling precedent does not allow the United States Government to exploit the Mississippi statutory authority vested in a financial examiner to search the premises until the examiner has acquired sufficient evidence to secure a search warrant. Here, the Government knowingly used and paid a contract employee of MID to do what it was prohibited from doing, searching without a warrant.[14] Pursuant to the majority opinion, the Government may now effectively

---

[13]In light of the district court's finding that "Gober agreed [with the Government] that if he were to again encounter what he believed to be evidence of criminal conduct by Mississippi insurers or *MID,* he would furnish such information to the FBI," and Gober's testimony that he secretly recorded conversations he had with MID officials, one may speculate whether MID would have passed any incriminating information on to the FBI. (emphasis added). As such, the Government acquiesced not only in Gober's search of Blocker but also in an investigation of MID itself.

[14]As the majority notes, maj. op. at 1581 n. 8, it is clear that if Gober had not had any contact with the FBI but nevertheless searched with the intention of turning over any incriminating evidence to the FBI, there would be no violation of the Fourth Amendment. The majority thus reasons that whether Gober went to the FBI before or after searching is a distinction without a difference. I cannot agree. If Gober had waited to contact the FBI until after the examination,

circumvent the Fourth Amendment by repeatedly dispatching an administrative agent, one that it had compensated and equipped with a recording device, to search without a warrant. Indeed, there is nothing in the majority opinion that would preclude the FBI from *initiating* contact with another governmental or administrative agent who has authority to search whomever (or whatever) happens to be the target of a criminal investigation.[15]

Therefore, concluding that Gober was an agent of the Government and that Blocker had a reasonable expectation of privacy in the corporate records vis-a-vis Gober's relationship with the Federal Government, I would hold that the search conducted by Gober as an agent of the United States Government violated Blocker's rights under the Fourth Amendment.

That, however, does not end the analysis. A constitutional error may be deemed harmless if the beneficiary of a constitutional error proves beyond a reasonable doubt that the error complained of did not contribute to the verdict. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). As the court below stated, it was "undisputed that without the information provided by Gober, there would have been no probable cause for issuance of the February 7, 1992 warrant." Further, the warrant resulted in the seizure of the corporate records that were used to secure Blocker's convictions. Clearly, the evidence that should have been suppressed contributed to the verdict. The admission of the evidence therefore was not harmless. Because the evidence obtained from Blocker's search after he was compensated should have been excluded, I would reverse the district court's denial of Blocker's motion to suppress and remand the case to allow the district court to determine whether Blocker had standing to challenge the search, an issued raised but never addressed in the district court.

---

then the Government could not have known or acquiesced in the search and thus, by definition, Gober would not have been an agent of the Government. Of course, if Gober was not an agent of the Government, the Fourth Amendment was not violated. In my view, this case hinges on whether Gober was acting as an agent of the FBI. Because if he was an agent of the FBI, then he exceeded the scope of Blocker's implied consent under the Mississippi administrative scheme.

[15]Who initiated the contact (either the Federal Government or the person conducting the search) is simply a consideration in determining if the person acted as an agent of the Government. *Bazan,* 807 F.2d at 1204. Here, the majority declares that it is immaterial whether the person actually was an agent of the Government because the person had the authority to search under the administrative exception to the warrant requirement.