**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 94-10849**
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**JOSEPH STEDMAN, and**
**GARY A. GORDON,**

**Defendants-Appellants.**

_____

**Appeal from the United States District Court**
**for the Northern District of Texas**
**November 13, 1995**

_____

Before REYNALDO G. GARZA, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The principal issue at hand is loan loss determination under the Sentencing Guidelines. Joseph Stedman and Gary A. Gordon appeal their convictions and sentences for: conspiracy, in violation of 18 U.S.C. § 371; misapplication of bank funds, in violation of 18 U.S.C. § 656; and false entries in bank records, in violation of 18 U.S.C. § 1005. In addition to the loan loss issue, both contest the Government's peremptory challenges, and the restitution orders. Stedman claims also insufficient evidence and ineffective counsel. We **AFFIRM.**

Stedman was Chief Executive Officer, and Gordon, President, of the Lone Star National Bank in Dallas, Texas, whose accounts were insured by the FDIC.  The bank, which was heavily involved in real estate loans, opened in August 1984, and, upon deteriorating financially, closed in November 1990.

The Government introduced evidence that, during the bank's decline, Stedman, among other improper actions, instructed employees to remove from loan files documents that would have reflected adversely on ailing loans; and that Gordon, subservient to Stedman, was present when documents were removed and knew about the scheme.  It posited that, by transferring these materials to secret ("contra") files, the defendants were able to make the loans appear healthier to federal regulators.

As a result, Lone Star, *inter alia*, avoided unwelcome decreases in its capital, because the regulators did not require it to increase its loan loss reserves, which would have been the likely result had they not been denied access to negative borrower information.  By this scheme, Lone Star's assets were fraudulently made to look better than they were.  Likewise, the Comptroller of the Currency (OCC) and FDIC were impeded from performing regulatory functions because, by concealing information that reflected negatively on the loans, the defendants gave them a misleading picture of the bank's financial health, and this prevented the OCC and FDIC from taking remedial measures.

The Government also introduced evidence that the defendants misapplied bank funds by, during bank hours, requiring bank employees to perform non-banking activities that personally benefitted the defendants.

## II.

At issue are whether: (1) the Government's peremptory challenges were gender based; (2) the evidence was sufficient to convict Stedman; (3) Stedman received ineffective assistance of counsel; and (4) the use of the total loan loss amount for determining sentence was erroneous; and, as a result, (5) the restitution orders were erroneous.

## A.

Stedman and Gordon contend that the district court allowed the Government to use five of its six peremptory challenges in a manner calculated to discriminate on the basis of gender. The **Batson v. Kentucky**, 476 U.S. 79 (1986), proscription against race based peremptory challenges was extended in **J.E.B v. Alabama**, __ U.S. __, 114 S. Ct. 1419 (1994) to gender based strikes.

Once a party has challenged the basis for a strike, the striking party must articulate a nondiscriminatory reason for it. **Hernandez v. New York**, 500 U.S. 352, 358 (1991). And, the court's ruling on the motivation for the strike is a finding of fact reviewed only for clear error. *E.g.,* **United States v. Bentley-Smith**, 2 F.3d 1368, 1372 (5th Cir. 1993).

The Government explained that its strikes were motivated by the following: one person's ambivalence about the concept of aiding

and abetting; another's lack of any strong conviction; another's failure to stay for a conference about conflicts; another's favorable reaction to a defense attorney; and another's inability to concentrate on the case due to her concern about her young child. The district court found that the Government had credibly explained a nondiscriminatory purpose; it further found relevant that four women were impaneled. There was no clear error.

## B.

Stedman and Gordon testified. As for Stedman's sufficiency challenge, and as is more than well-known, we must allow a conviction to stand if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia* 443 U.S. 307 (1974).

Our review of the evidence more than satisfies us that the *Jackson* standard has been met. The Government provided testimonial evidence that, *inter alia*, Stedman required all decisions to go through him; knew of, and directed, the creation and maintenance of the "contra" files; and gave directions to employees on "ranch days", which required them to be absent from their banking duties in order to, among other duties, repair apartment buildings owned by Stedman and Gordon.

## C.

Stedman claims ineffective assistance of counsel because his attorney failed to: (1) make an opening statement; (2) cross-examine several of the Government's witnesses; and (3) object to an

organizational chart.  Of course, to prevail on this claim, he must demonstrate both that his attorney's efforts fell below an objective standard of reasonableness, and that a reasonable probability exists that, but for the errors, the result of the trial would have been different.  ***Strickland v. Washington***, 466 U.S. 668, 688 (1984).

For each of the three instances, the decision could be motivated by reasonable tactical objectives.  For example, as for waiving the opening statement, Stedman's co-defendant made one, and Stedman's attorney could have concluded that another would be wastefully duplicative or unhelpful.  But, in any event, for none of the three instances does Stedman state why the trial would have ended differently; his claim fails.

D.

Stedman and Gordon assert that the loss calculation used to determine their sentences was error; that they should not have been held accountable for the total losses that the bank suffered on the loans, because their conduct in issue was only responsible for a portion of that loss.  We review loss calculations only for clear error; on the other hand, interpretation of the Guidelines is a question of law requiring plenary review.  *E.g.,* ***United States v. Hill***, __ F.3d __, 1995 WL 5879 (5th Cir. 1995).  Even assuming *arguendo* that the claimed error is instead one of interpretation, we find no error.

Stedman and Gordon were sentenced in consideration of U.S.S.G. § 2F1.1 for offenses involving fraud or deceit; a precise

determination of the loss amount is not required. U.S.S.G. § 2F1.1, comment, n.8. The Presentence Report (PSR) aggregated the bank's losses for each of the loans in association with which Stedman and Gordon hid information.[1] The court sentenced using that amount.

Stedman and Gordon urge us to hold that the sentencing loss amount should be only that part of the loss for which their illegal conduct was the cause.[2] They maintain that a portion of the loss was unavoidable, that the bank was financially troubled before they concealed information. Accordingly, they conclude that the sentencing court must determine the loss amount for which their wrongful conduct was the sole cause, and use only that amount in sentencing. As hereinafter discussed, we refuse to so interpret the Guidelines.

The impracticability of the course urged by Stedman and Gordon is perhaps best demonstrated by their inability to offer a reasonable figure for the loss. The methodology suggested by Gordon for calculating the portion of the loss for which they are responsible fails to reflect adequately the substantial losses to

---

[1]    According to the PSR, the 66 loans totaled $8,117,626.88; the bank's resulting losses, $5,659,713.71. The PSR stated that the latter was the amount of loss.

[2]    Stedman maintains cryptically that the calculations in the PSR were "factually incorrect". Without further explanation, he refers only to his objections to the PSR. The nature of this argument is unclear from both his brief and the Addendum to the PSR, which reflects his objections but explains nothing about a contention of factual errors rendering the PSR unreliable. In any event, we do not address issues not explained in a brief. *See* FED. R. APP. P. 28(6) (requiring appellants' briefs to contain contentions and reasons therefor).

which the bank was exposed.[3] Realistically, no one can assess such a thing precisely; and we refuse to ask sentencing courts to undertake such Herculean tasks or to afford the benefit of the doubt to bank officers who engage in wrongful conduct. As the district court aptly noted, the "wrongdoer is not entitled to complain that [the losses] cannot be measured with the exactness and precision that would be possible in the case which he alone is responsible for making or otherwise".

Moreover, our holding is consistent with the analogous situation in which the face amount of a fraudulently presented instrument was considered the loss, even though the presenter drew only a portion of the funds. *United States v. Wimbish*, 980 F.2d 312 (5th Cir. 1992). There, the defendant was found guilty of perpetrating a scheme by which he deposited fraudulent checks, and then withdrew only a portion of the face amount. *Id.* at 313. We held the defendant accountable for the entire loss to which the bank was exposed (the face amount), rather than for only the amount actually lost (the amount withdrawn). *Id.* at 316.

This situation is similar; Stedman and Gordon exposed the bank to the possibility of loss for the entire loan amount when they chose to impede regulators from considering information that could have led them to intercede to protect the bank. Attributing the entire amount of loss to Stedman and Gordon is no more unfair than

_____

[3]      Gordon's assertion that $113,355 represents the loss for which the defendants should be charged does not explain how the amount relates to their activity. Gordon fails to demonstrate how his calculation is more reflective of the responsibility of the defendants.

- 7 -

attributing the face amount of the fraudulent checks to the defendant in *Wimbish*. The fact that Stedman and Gordon's crimes were more sophisticated does not compel us to treat them more leniently.

In addition, deterrence would be undermined by the approach advanced by Stedman and Gordon because, by complicating the transaction underlying their criminal conduct, defrauders could manipulate to their advantage the losses for which they might be charged. In short, we refuse to interpret the Guidelines to allow parties who choose to commit complex or complicated bank crimes to receive a windfall simply because of the very complexity of those crimes.

We note also that this type of bank fraud is more likely to occur with respect to unhealthy loans or during financially hard times. By requiring sentencing courts to ferret out the discrete amount attributable solely to the fraud of those who commit similar crimes, we would provide wrongdoers an ideal instrument -- a troubled loan -- for their fraud. Were we to hold that a troubled real estate market provides a safe haven for bank officers to fraudulently tamper with loan records, we would produce the noxious result that markets unfriendly to real estate ventures would be friendly to bank crimes.

In sum, the Guidelines are adequately flexible to allow the sentencing court to hold these defendants responsible for the entire loss associated with these loans.

E.

Because we find no error in the application of the Guidelines, we reject as well Stedman and Gordon's claims that their restitution orders were erroneous. Further, we reject Stedman's contention that the district court disregarded his ability to pay the amount of restitution ordered. The latter claim ignores the fact that the court adopted the PSR, which stated the following about Stedman's ability to pay restitution:

> Based on the information provided, [Stedman] does not appear to have the ability to pay a fine or restitution *immediately*, if such an obligation is imposed by the Court. *However, he does have marketable skills and abilities that could generate income to allow installment payments on such obligation.*

(Emphasis added.)

Moreover, Stedman made no objection to the adoption of the PSR at his sentencing hearing. Therefore, we review only for plain error. **United States v. Calverly**, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc) (if appellant shows clear or obvious error that affects his substantial rights, appellate court has discretion to correct errors that seriously affect the fairness, integrity, or public reputation of judicial proceedings) *cert. denied*, __ U.S. __, 115 S. Ct. 1266 (1995). Because Stedman's ability to pay was considered, we cannot say that the restitution decision constitutes the type of clear or obvious error required under our plain error standard. *Id.* at 162.

III.

For the foregoing reasons, the judgments are

**AFFIRMED**.