**UNITED STATES of America, Plaintiff,**

v.

**Lorenzo MUÑOZ FRANCO, et al., Defendants.**

**Criminal No. 95–386(DRD).**

United States District Court, D. Puerto Rico.

Feb. 27, 2004.

See also 203 F.Supp.2d 102.

Andres Guillemard–Noble, Nachman & Guillemard, Harry Anduze–Montano, Jorge L. Arroyo–Alejandro, Jorge L. Arroyo Law Office, San Juan, PR, R.J. Cinquegrana, Boston, MA, David W. Roman, Brown & Ubarri, San Juan, PR, Duncan Stevens, Miller & Chevalier, Chartered, Washington, DC, Jorge L. Diaz–Reveron, San Juan, PR, Mark Rochon, Miller & Chevalier, Chartered, Washington, DC, Ricardo L. Rodriguez–Padilla, Rodriguez Padilla Law Office, San Juan, PR, Joseph J. Rucci, Rucci, Burnham, Carta and Edelberg, LLP, Darien, CT, Michael S. Pasano, Zuckerman Spaeder Taylor & Evans, Miami, FL, Pedro Zorrilla–Martinez, Francisco M. Dolz–Sanchez, Francisco M. Dolz Law Office, San Juan, PR, for Defendants.

Desiree Laborde–Sanfiorenzo, Jorge E. Vega–Pacheco, Maria Dominguez–Victoriano, United States Attorney's Office, San Juan, PR, for Plaintiff.

## AMENDED SENTENCING OPINION AND ORDER

DOMINGUEZ, District Judge.

At the end of the hearing held on December 19, 2003, after the testimony of José B. Cantalapiedra, the former President of Banco Santander, the institution that acquired the assets of Caguas Central Federal Savings and Loan, the United States Assistant Attorney, María L. Domínguez Victoriano, announced that the United States would not be relying on the theory of "actual losses" but on the theory of "intended losses," all under U.S.S.G. 2F1.1. The court determined that co-defendants had suffered no real prejudice by a change in theory since most of the evidence as to losses had entered into the record during the trial phase of the case [1]; further the United States had the option under the guidelines to proceed "under actual or intended loss to the victim whichever is greater." *United States v. Edwards,* 303 F.3d 606, 645 (5th Cir.2002); *United States v. González–Alvarez,* 277 F.3d 73, 77 (1st Cir.2003). (See Docket No. 1477.)

The court, however, granted the defendants a continuance enabling them to express their position to the United States Submission of Corrected Motion of Intended Loss, (Docket No. 1466), and Corrected Motion on Intended Loss for Sentencing Purposes, (Docket No. 1467). An initial continuance was granted because of the

---

1. The written charge of the court contained at Docket No. 1278, clearly instructed the jury not to concern itself with the value of the loss.

For the purposes of this Order the court presumes a reading of that portion of the charge to the jury.

extended Christmas holidays until January 7, 2004; finally because of unavailability of some of the counsel of defendants sentencing was resumed on February 4th, 5th, and 6th of 2004. (See Dockets No. 1482 and 1485.) The defendants had plenty of time to object to the submittal of intended loss filed by the United States. Co-defendants did in fact react to the submittal of the United States: Ariel Gutierrez, (Docket No. 1479); Dr. Francisco Sánchez–Aran, (Docket No. 1478); Dr. Francisco Sánchez–Aran's Response to Government's Filings Outlining Unauthorized Financial Transactions, (Docket No. 1469); Lorenzo Muñoz Franco's Objection to the Government's Motion on Intended Loss and Motion for New Trial, (Docket No. 1468); defendant Ariel Gutierrez' Motion for New Trial Based on Newly Discovered Evidence, (Docket No. 1487). The court shall abstain from ruling on the Motion for New Trial until certain pertinent testimony is transcribed.

■ The court is concerned about an argument raised by co-counsel for co-defendant Lorenz Muñoz Franco, Counsel R.J. Cinquegrana based on the case of *United States v. Schneider*, 930 F.2d 555, 558 (7th Cir.1991). The case of *United States v. Schneider*, supra, was adopted by the First Circuit in the case of *United States v. Haggert*, 980 F.2d 8, 12 (1st Cir.1992), describing the two types of fraudulent conduct:

> The first type of fraud implicates the "true con artist," who never intends to perform the undertaking, such as the terms of the contract or loan repayments, but who intends only to pocket the money without rendering any service in return. The second type of fraud involves a person who would not have attained the contract or loan but for the fraud, **but who fully intends to perform.** In the latter case, and only in the latter case, is the intended loss not to be considered for sentencing. (Emphasis ours.)

See also *United States v. Blastos,* 258 F.3d 25, 30 (1st Cir.2001).

Co-defendant alleges basically that the United States cannot return to "intended loss" because the President of the Bank and Chief Executive Officer, Lorenzo Muñoz Franco, did not intend to do harm to the loan and wanted the loans to co-defendant Gutierrez (Modules' loans) as well as the loans to Mirandez to work and be paid. Co-defendant Gutierrez joins alleging that the Modules loans, and the loans to other construction developers utilizing modules as the subcontractors all had intent to comply with payment with the loans provided by Caguas Federal. Hence, the second type of fraud described above, the culpable fraudulent party that "fully intends to perform ..." "the intended loss [calculous] cannot be considered for sentencing."

■ The court starts the analysis reminding the parties that only intent to deceive is necessary and not intent to harm the bank in bank fraud cases. *United States v. Kenrick,* 221 F.3d 19, 26–29 (1st Cir.2000—en banc), *cert. denied Kenrick v. United States,* 531 U.S. 961, 121 S.Ct. 387, 148 L.Ed.2d 299 (2000) [t]he intent necessary for a bank fraud conviction is an intent to deceive the bank in order to obtain for it money or other property. Intent to harm is not required ..."

The court in the Opinion and Order entered on February 6, 2003, disposing of all then filed Rule 29 Motions, (Docket No. 1339), provided various examples of attempts to deceive the Board of Directors regulators and the government regulators carried on by co-defendants Muñoz–Franco and Sánchez–Aran. Further, the court provided various examples of preferential treatment provided which clearly denoted the conduct co-defendants Muñoz–Franco and Sánchez–Aran of intent to deceive.

Said conduct by co-defendants Muñoz–Franco/Sánchez–Aran leads to the conclusion under the standard now required of preponderance of evidence that the two co-defendants knew that the loan scheme would not work in the short and long run.

The court relates but a few examples:

1. Modules was not fulfilling its obligation to build units for those construction projects financed.

2. Modules was being paid for work which had not been completed (construction certifications paid that were not earned by completed work).

3. Modules was repaying prior unrelated loans for Caguas Central solely from new construction project loans earned by Caguas Central. The payment of prior loans (principal and interest) considerably weakened the ability to comply with the construction object of the loan. Consequently, there was no budget to fulfill construction requirements.

4. Loans were disbursed prior to approval of loans and/or prior to date of execution of the loan.

5. Loans were disbursed without Board's approval.

6. Loans were disbursed ahead of Board's approval (the Board subsequently was not advised of the advance).

7. Units were not delivered pursuant to the contract.

8. Nominee loans established to camouflage loans to Modules.

9. Large amounts of overdraft checks were paid relating to Modules accounts.

10. Developers were sought and granted loans only if Modules were used as the subcontractor. Later the loans were subject to payments to Modules without approval or knowledge of the developer borrower of the loans. (See Docket No. 1339, p. 13–15.)

11. Years passed (1984–1986) and Modules did not pay any principal or interest to construction loans except by taking moneys from other construction loans. (This was not advised to the Board.) [2]

As to the government auditors and regulators Muñoz and Sánchez–Aran incurred in the following conduct:

1. "... We hereby ratify that this board was fully informed in detail by management of all matters pertaining to the bank's involvement with Modules and related companies before granting all loans." (Docket No. 186, p. 2–3.) The statement is false since the Board was not informed that moneys were used to pay principal and interest in other loans thereby weakening the loan approved by the Board dooming the construction project to failure by lack of financing.

2. "This Board of Directors wishes to states in unclear and uncertain terms that it has **never** considered and much less approved any policy or practice of permitting borrowers to use construction loan proceeds to satisfy or **make interest payments on other unrelated loans.**" This statement is false and notwithstanding counsel gallant effort to make all loans related, this court does not consider a loan related unless a contemporary document related the loans and specifically authorized the disbursement. Under counsel's theory all loans are related merely because the loaned entities are related. Further, the loans considered by the court were not approved as "work out loans" and do not even mention prior loans in any of the loan documents. [3]

---

2. As to all facts stated at § 1, §§ 11 of this page, see generally Docket No. 1339, p. 5–8.

3. When there was collateralization of a loan with another loan even expressed on another

3. Jardines de Villa Alba, Inc.—"It is management's opinion that the value of the fully developed land plus the units **which are already in place in the project are enough to pay of the indebtedness of the bank upon completion."** This constitutes a gross misstatement. The statement is a cover up, for in excess of twenty houses were paid to Modules notwithstanding that only one house was actually erected on the project. Allegedly the Modules were constructed at the factory but even the foundations were disbursed. The court examined photographic evidence, (Ex. 189), clearly showing that the housing project except for one house was not built. Further, paying the Modules at the factory but not installed at the project and paying foundations not at the building site constitutes a windfall for Modules and against the Bank. Notwithstanding, it is affirmed in the Denby letter that "units" are "already in place" in the project; this statement is a further gross misrepresentation since there was only one unit in place.

4. The regulators were not disclosed certifications for work not completed.

5. The regulators/auditors were not disclosed payments from one loan to another disguising a loan as a performing loan when said loan was in reality an outstanding loan which was reportable.[4]

6. Income from Modules and Mirandez's loans were fictitiously carried as performing loans; this practice was in-

appropriate as it constituted unearned income reportable to the auditors.

7. Construction deficiencies in the projects were not duly reported to the auditors.[5]

The described conduct by both co-defendants Muñoz and Sánchez–Aran constituted a well-developed scheme to disguise the true economic state of Modules and Mirandez's loans. The conduct was a sophisticated kiting like scheme using construction loans instead of checks. It was obvious to a banker that the scheme was to eventually flounder as it did fail. This conduct leads to the inescapable conclusion that the loans were not to be repaid since the plan started with moneys derailed from one loan to another causing the predictable collapse of the projects. The conduct even sought authority from the Board for a project wherein the Board ignored that the then authorized project could not be timely started on the site because the site was precisely occupied by the Module manufactory plant.[6] Notwithstanding, payments were approved and no construction was built yet Modules was paid in full. Finally, the deception to the regulators further constitutes evidence that the loans were intended not to be complied.

■ As to co-defendant Ariel Gutierrez, the non compliance intent can be determined by the fact that moving moneys from one loan to another clearly dooms to failure the project since the ultimate result simply means that the project lacks economic viability to be constructed. These

document the court considered the loan related.

**4.** Although counsel insist that all Modules loans were "related loans," the court clearly recalls auditor González distinctly stating, as unrebutted evidence, that Muñoz and Sánchez–Aran admitted to the practice when confronted by González. See Opinion and Order (R. 29), Docket No. 1339, p. 12.

**5.** The statements of § 1–6 stated at p. 5–6 of this Order, are expressed in Docket 1339, p. 10–12.

**6.** The Board upon initial granting of the loan for La Marina Project (Dow phase) ignored that eighty-five units could not be timely built because the Modules Plant was located on the site of construction of the housing project to be built.

loans were not "work out loans" because when the moneys were taken out, the construction budget that remained was then insufficient to comply. Further, the history of lack of building compliance, unwarranted payment of certifications, unwarranted advances, unapproved Board loans, together with history of failure in payment of loans constitute circumstantial evidence of intent not to comply.

Hence, the court offers no resistance to the legal theory of the *United States v. Schneider*, 930 F.2d at 558 and the adoption of that theory by the ruling Court of Appeals at *United States v. Haggert*, 980 F.2d at 12, as also followed in *United States v. Blastos*, 258 F.3d at 30. However, the shoe does not fit because the theory lacks factual underpinnings. Hence, the court may use "intended loss" because there is plenty of evidence under the preponderance of evidence standard to justify that the affected co-defendants did not intent the loans to perform.

## II. THE INTENDED LOSS—THE GUTIERREZ'S LOANS

■ "In loss application cases the loss is the actual loss to the victim ... However, when the intended loss is greater than the actual loss, the intended loss is to be used. U.S.S.G. § 2F 1.1." [7] Further, "intended losses need not to be determined with precision: [T]he court needs only make a reasonable estimate of the loss, given the available information." *United States v. Stein*, 233 F.3d 6, 18 (1st Cir.) *cert. denied* 532 U.S. 943, 121 S.Ct. 1406, 149 L.Ed.2d 348 (2001). See also *United States v. Blastos*, 258 F.3d at 30. An intended loss calculous should pass muster

"where there is good evidence of actual intent and some prospect of success." *United States v. Robbio*, 186 F.3d 37, 44 (1st Cir.), *cert. denied* 528 U.S. 1056, 120 S.Ct. 602, 145 L.Ed.2d 500 (1999).

■ The court finds particularly applicable to the instant case the factual scenario and holding in the case of *United States v. Stedman*, 69 F.3d 737 (5th Cir. 1995), *cert. denied* 517 U.S. 1250, 116 S.Ct. 2512, 135 L.Ed.2d 201; *rehearing denied* 519 U.S. 912, 117 S.Ct. 280, 136 L.Ed.2d 200 (1996). This case involved the Chief Executive Officer Joseph Stedman and Gary Gordon, the President of Lone Star National Bank in Dallas, Texas. The bank was "heavily involved in real estate loans" as was Caguas Central in the instant case. *United States v. Stedman*, 69 F.3d at 739. The bank deteriorated financially in six years and was closed in 1990. The accounts were all insured by the FDIC. The government introduced evidence that Stedman in an effort to disguise the regulators "ordered employees to remove from loan files documents that would have affected adversely an ailing loan ... Gordon ... was present when the documents were removed and knew about the scheme." The idea was "to make the loans appear healthier to the regulators." *United States v. Stedman*, 69 F.3d at 739. As a consequence of the scheme of Stedman and Gordon, the bank "avoided unwelcome decreases in capital because the regulators did not require it to increase its loan loss reserves, which would have been the likely result had [the regulators] not been denied access to the negative borrower information. By this scheme Lone Star assets

---

**7.** Said policy statement read in 1987 as follows: "In keeping with the commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure will be used if it was larger than the actual loss." 1987 U.S.S.G. 2F 1.1 n. 7. The court may use new application notes if they are "clarifying rather than substantive" in nature. Se U.S.S.G.1B1.11. See also *Stinson v. United States*, 508 U.S. 36, 39–40, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993) followed in the case of *United States v. Bennett*, 37 F.3d 687, 695 (1st Cir.1994).

were fraudulently made to look better than they were." *United States v. Stedman*, 69 F.3d at 739. The court deems that in the instant case the facts are striking similarly.[8] The scheme at Caguas Central Federal Savings and Lone Star had the same purpose, concealing from the regulators, then the Comptroller of the Currency (OCC) and the FDIC from performing reliable audits: "By concealing information that reflected negatively on the loans, the defendants gave them a misleading picture of the bank's financial health ..." *United States v. Stedman*, 69 F.3d at 739.

In the instant case as depicted in the court's Opinion and Order at Docket No. 1339, the regulators were also misled as to the construction loans at Caguas. Loans were depicted as performing loans because the regulators were not advised as to payments on principal and interest emanating from other loans. Further income on the non performing loans was inappropriately created and reserves were avoided all to provide a fictitious construction loan scenario. In the instant case, since the liability created was larger, the bank operations created had to be more sophisticated: Larger amounts of overdrafts were paid to Modules; a kiting scheme was created with Modules construction loans, one following another; other new developers were sought but they had to utilize the debtor in economic trouble (Modules) enabling moneys to be funneled by the bank to the troubled debtor; unapproved Board of Directors loans were extended; moneys were disbursed lacking proper performance.

In *United States v. Stedman*, 69 F.3d at 740, the PSR "aggregated the bank losses for each of the loans in association for which Stedman and Gordon hid information," hence the resulting loss from each

loan was imputed to defendants. *United States v. Stedman*, 69 F.3d at 740, n. 1. Stedman and Gordon urged the sentencing court "to hold that the sentencing loss amount should be only the part of the loss for which their illegal conduct was the cause" but not for the resulting loss. The court held that "realistically no one can assess such a thing precisely; and we refuse to ask sentencing courts to undertake such Herculean task or to ask sentencing courts to afford the benefit of the doubt to bank officers who engage in wrongful conduct." *United States v. Stedman*, 69 F.3d at 740–741. The court concluded "In short we refuse to interpret the guidelines to allow the parties who choose to commit complex or complicated bank crimes to receive a windfall simply because of the very complexity of those crimes." *United States v. Stedman*, 69 F.3d at 737. The court rejected the argument advanced by Stedman and Gordon: "Accordingly they [Stedman and Gordon] conclude that the sentencing court must determine the loss amount for which their wrongful conduct was the sole cause and use only that amount in sentencing. As herein discussed, we refuse to so interpret the guidelines." *United States v. Stedman*, 69 F.3d at 740.

This court finds reasonable and will follow the holding of *United States v. Stedman*, 69 F.3d 737. Fraudulent loan tampering will not receive from the court a safe haven for bank officers incurring in fraud since "this type of bank fraud is more likely to occur with respect to unhealthy loans or during financial hard times." *United States v. Stedman*, 69 F.3d 737.

▮ The court deems that the economic theory of intended loss expressed under

---

8. The loans at Lone Star only involved 8.1 million dollars. In the instant case the loans add up to considerable more money.

*United States v. Stedman,* 69 F.3d at 738–741, is not "economically irrational." *United States v. Orlando Figueroa,* 229 F.3d 33, 48 (1st Cir.2000) citing *United States v. Schneider,* 930 F.2d at 558–559. Hence, those that incur in fraudulently tampering in loan records, hiding pertinent information from the regulators and/or incurring in other fraudulent conduct related to bank loans shall be assessed as "intended loss," the loss resulting from the loans. This is the basic teaching of *United States v. Stedman,* 69 F.3d at 741. "In sum, the guidelines are adequately flexible to allow the sentencing court to hold these defendants responsible for the entire (resulting) loss as associated with these loans."

## INTENDED LOSS—GUTIERREZ'S LOANS

For the reference of the readers the court has prepared various exhibits to this opinion of the nonperforming authorized loans and unauthorized loans of co-defendant Ariel Gutierrez setting forth the intended losses attributed to co-defendant Gutierrez and losses attributed to co-defendants Muñoz/Sánchez. The court provides at least partially the evidentiary source. Loans related to Gutierrez are marked Ex. I–A (La Marina), I(b) Levittown, I(c) Quintas de Country Club, I(d) Jardines de Villa Alba, I(e) Los Caciques, I(f) Los Mameyes, I(g) Cerrovista Project.

The intended loss is concluded as follows:

| | Co-defendant Gutierrez | Co-defendants Muñoz/Sánchez–Aran |
|---|---|---|
| La Marina I(a) | $ 717,000.00 | 1,100,000 million |
| Levittown I(b) | $ 860,000.00 | 3,100,000 million |
| Quintas de Country Club I(c) | $ 274,000.00 | 2,900,000 million |
| Jardines de Villa Alba I(d) | $ 297,000.00 | 297,000.00 |
| Los Caciques I(e) | $1,868,000.00 | 1,868,000.00 |
| Los Mameyes I(f) | $2,800,000.00 | 2,800.000.00 |
| Cerrovista I(g) | $1,841,177.00 | 1,841,177.00 |
| TOTAL: | $8,657,177.00 | $13,906,177.00 |

 The court following *United States v. Stedman,* 69 F.3d 737, first considers the wrongful fraudulent conduct of each defendant, i.e. an unauthorized Board loan, a wrongful certification payment, illegal advances, moneys transferred to pay principal and interest of other loans without Board's approval, moneys disbursed without Board's authorization, etc. The co-defendant is then charged with the amount of the resulting failure of the loan (not the entire original amount of the loan unless the entire amount is a subsequent failure). *United States v. Stedman,* 69 F.3d at 739–740. Further, there is substantial evidence complying with the preponderance of evidence standard that the regulators were deceived "Stedman and Gordon [similar to Muñoz/Sánchez–Aran] exposed the bank to the possibility of loss for the entire loan amount when they chose to impede regulators from considering information that could have led them to intercede to protect the bank," *United States v. Stedman,* 69 F.3d at 741.

 The court adds an appropriate caveat, that a victim's negligence to properly mitigate and/or the negligence of intervening actors "does not prevent attributing to the defendants the full amount of the loss." *United States v. Berkowitz,* 927 F.2d 1376, 1390 (7th Cir.), cert. denied 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991); *United States v. Miller,* 962 F.2d 739, 744 (7th Cir.1992); further, "the exis-

tence of intervening causes does not provide for a basis for reducing the amount of loss under Section 2F 1.1(b)(1)", *United States v. Morris,* 80 F.3d 1151, 1173 (7th Cir.), cert. denied *Gardner v. United States,* 519 U.S. 868, 117 S.Ct. 181, 136 L.Ed.2d 120 (1976). Hence, arguments that the loans were passed on to others borrowers (La Marina loans) and new borrowers failed to pay and/or increased the loans and/or that there was a guarantee when the borrower exited the original loan, the resulting loss will not decrease or diminish the "intended loss" calculation.

## INTENDED LOSS THE MIRANDEZ'S LOANS

■ The Mirandez's loans receive the same treatment by the court as the Gutierrez's loans. The loss to the Mirandez's loans affects only co-defendants Muñoz and Sánchez–Aran. The court in its Opinion and Order denying the Rule 29 Motion, Docket No. 1339, p. 32–40, sets forth specific conduct by Sánchez–Aran and Muñoz–Franco that establishes criminal liability as to both co-defendants describing fraudulent activity relating to said loans. The court restates salient findings. Loans were disbursed without Board's approval, construction certificates were authorized for work not performed and/or completed as certified. Further, moneys from one loan were derailed to pay interest and/or principal as to other unrelated loans. This process maintained an appearance of performance as to loans and disguised as income producing loans what otherwise were non performing loans that would otherwise cause reserves to be established by the regulators. Once again the Board was not notified as to shifting of moneys to pay other loans and Mirandez's requests to the contrary were quickly dismissed by Sánchez–Aran. Loans were increased without additional collateral. Direct transfers of loan proceeds were made internally by the bank even without knowledge of Mirandez. Co-defendant Muñoz was kept fully informed through the cumulative reports of the borrowers status and construction reports of both Gutierrez and Mirandez's loans prepared and presented to him as testified by Ms. Enriquez. Further, Ms. Enriquez indicated that her calendar showed extensive meetings between her, Muñoz–Franco and Sánchez–Aran regarding Mirandez and Gutierrez's loans. Muñoz–Franco and Sánchez–Aran were present in many of the Mirandez's loan presentations to the Board of Directors. (Reparto Valenciano Ex. 7(b), Bubao II Ex. 14(b), Extensión Marisol Ex. 62(a), Vistas Atlántico II Ex. 8(b), Gurabo I, Ex. 125(a)). Payments of construction certificates were unduly authorized by Dr. Sánchez–Aran. Muñoz further prevented the bank internal auditor from auditing the construction loans including the Mirandez's loans. Later when the regulators are in the hunt of the irregularities of the construction loans, Muñoz and Sánchez–Aran are instrumental in the preparing of the Denby letter, Ex. 186, wherein it is stated that "**never** [has the Board] considered and much less approved **any policy or practice of permitting borrowers to use construction loan proceeds to satisfy or make interest payments on other unrelated loans.**" The record reflects a continued practice to the point where moneys were internally transferred in the Bank without knowledge of the borrower/constructor thereby weakening the loan. The court concludes on preponderance of the evidence standard, based on circumstantial and direct evidence, that both Muñoz and Sánchez–Aran knew and approved of the practice of paying with loan proceeds for the principal and interests of other unrelated loans and knew about unwarranted construction certification payments. This, of course, created a fictitious scenario of performing loans and income derived from these loans when in

reality they were non performing loans which mandated reserves to be established by the regulators.

The intended losses as to Muñoz/Sánchez–Aran are as follows as more fully explained at Ex. II (Mirandez's loans). All loans are explained with specific references to exhibits at Ex. II(a) through II(m). The construction loans are the following:

| | | |
|---|---|---:|
| II(a) | Reparto Valenciano | 2,200,000 |
| (b) | Villas del Gurabo I | 90,000 |
| (c) | Villas del Gurabo II | 440,873 |
| (d) | Jardines de Bubao I | 525,000 |
| (e) | Jardines de Bubao II | 563,500 |
| (f) | Extensión Marisol | 46,000 |
| (g) | Las Carolinas I | 110,788 |
| (h) | Las Carolinas II | 565,000 |
| (i) | Valle Piedras | 785,000 |
| (j) | Paseo Santa Juanita | 93,405 |
| (k) | Villa Santa Juanita | 283,000 |
| (l) | Vistas de Atlántico II | 255,000 |
| (m) | Valle Bello | 1,905,662 |

TOTAL intended loss attributed to co-defendants Muñoz/Sánchez–Aran: $7,862,566

Each loan is attributed conduct which warrants the *Stedman* "intended loss" conclusion of attributing the resulting loan loss to those responsible for the fraudulent conduct. (Unauthorized loan increases, disbursements to pay other loans, transfers of loan amounts, payment of certification for work not performed, loans disbursed without Board approval and/or increased without Board approval, etc.)

## INTENDED LOSS CO–DEFENDANT UMPIERRE

■ The salient facts related to co-defendant Umpierre are stated in the court's Opinion and Order of February 6, 2003, Docket No. 1339, at p. 13–17. As to co-defendant Wilfredo Umpierre the testimony at trial provided by Mr. Jorge Fabregas and Ms. Anabel Enriquez established that co-defendant Umpierre and Gutierrez signed and delivered construction certificates to the bank, (in some cases the certifications pre 1984 were pre-pared by Umpierre, his handwriting, and signed by others or him). They received the corresponding payments though the construction work was not completed and hence the certificate was not earned. The conduct occurred when Modules was the developer/borrower as well as when the developer/borrower was another company, or when the developer/borrower was Mr. Montilla. A similar scenario was repeated when the borrower/developer was Mr. Santiago the developer of Los Caciques Project. Santiago testified, for example, that as to Los Caciques Project a $750,000 payment was made directly to Modules from the project and he never saw the payment. Some checks were issued directly to Modules, other checks were issued jointly to his company and Modules requiring his signature; the checks required Santiago's signature but he never endorsed the checks. One check was even used to pay a Modules commercial loan to the bank without Santiago's knowledge. John Burns was rejected twice as a developer seeking finance from Caguas. Defendant Umpierre made to Mr. Burns a similar offer than that previously received and accepted by Montilla and Santiago. Umpierre would obtain the financing from Caguas Bank if Mr. Burns used Modules instead of conventional housing units. Burns accepted the offer. After only one week elapsed, Caguas Central Bank approved an 8.9 million dollar construction loan for the Cerrovista Project. Further evidence showed that Ariel Gutierrez and Umpierre made offers to various developers to obtain Caguas Central loans, if Modules units were used in the project.

As to Montilla, he had been denied financing by Caguas on three occasions but received financing in exchange for using Modules in the Jardines de Villa Alba Project. After accepting Umpierre's offer, Mr. Montilla received financing for $1,000,000.00 in two and a half months

from Caguas Central. Two hundred and thirty thousand dollars ($230,000.00) were disbursed directly to Modules prior to the closing of the loan documents without the knowledge of the borrower/developer Montilla. The loan settlement was faulty as it indicated that $747,000 was available to the borrower at closing when only $485,000 was available. A $1.4 million land loan cost was set forth in the loan document yet only $480,000.00 was the real cost, the difference was ultimately utilized to repay a prior outstanding debt owed by Modules to Caguas on other loans. (Ex.24(a).)

The court applies the *United States v. Stedman*, 69 F.3d at 741 doctrine to co-defendant Umpierre. He is to be responsible for the resulting loss associated with the loans that Umpierre facilitated through false certifications and wherein he acted as an agent of Modules and/or Caguas Central seeking developers for Caguas Central using Modules units.

| | |
|---|---|
| Levittown Plaza | $ 460,000.00 [9] |
| Quintas de Country Club | 214,000.00 |
| Villa Alba | 66,000.00 |
| Los Caciques | $1,200,000.00 |
| Cerrovista | 909,000.00 |
| | |
| TOTAL | $2,849,000.00 |

In conclusion, co-defendants Muñoz–Franco and Sánchez–Aran's responsibility on intended loss calculation constitutes the addition of the intended loss related to the Gutierrez's loans ($13,906,177.00) and the intended loss for the loans of Mirandez, ($7,862,566.00), for a total of $21,768,743.00. The intended loss calculation for co-defendant Gutierrez is $8,657,177.00. The intended loss calcula-

tion for co-defendant Umpierre is $2,849,000.00.

IT IS SO ORDERED.

---

9. In the Levittown Plaza Trans Globe phase, Umpierre prepares the certification (his handwriting) and signs on behalf of another (including Ariel Gutierrez). The same occurs in Country Club, Trans–Globe phase. This finding is made at sentencing phase closely examining the documents and taking into consideration Jorge Fabrega's testimony that Umpierre began to work as Vice–President of Finance of Trans–Globe around 1981–1982 (Fabregas, May 30, 2001 testimony, Tr. p. 131).